UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - x

WILLIAM ZABIT, and                         :
BRANDTRANSACT WORLDWIDE, INC.,
                                           :
                Plaintiffs,
                                           : SECOND AMENDED
     -against-                               COMPLAINT FOR
                                           : DECLARATORY, EQUITABLE
BRANDOMETRY, LLC, f/k/a BrandTransact        AND OTHER RELIEF
Investments, LLC, BRANDOMETRY GROUP, LLC, :
LARRY A. MEDIN, LAM ASSOCIATES, INC.,
SUSAN AVARDE, TONY WENZEL,                 :
BRANDLOGIC CORP. d/b/a Tenet Partners,
COREBRAND ANALYTICS, LLC, d/b/a Tenet      :
Partners, COREBRAND DATA SCIENCE,
TENET PARTNERS, HAMPTON BRIDWELL,          :
JAMES GREGORY, TOROSO INVESTMENTS, LLC,
d/b/a Tidal Growth Consultants,            :  20 Civ. 555 (JSR)
MICHAEL VENUTO, ACSI FUNDS,
EXPONENTIAL ETFs, PHIL BAK,                :
CHARLES A. RAGAUSS, EQM INDEXES, LLC,
JANE EDMONDSON, FRANK ZARABI, a/k/a        :
Farhad M. Zarabi a/k/a Farhad Zarabi,
BACON LAW GROUP and THOMAS C. BACON,       :

                Defendants.                :

- - - - - - - - - - - - - - - - - - - - - x

        Plaintiffs, BRANDTRANSACT WORLDWIDE, INC., and WILLIAM

ZABIT, by their attorney, Alexander E. Eisemann, for their

second-amended complaint, complain of the defendants and

respectfully show to the Court as follows:

                        <u>INTRODUCTION</u>

        1.    This is a case about a venal, methodically-

orchestrated, plot to steal both the idea of a groundbreaking

stock-index concept from its developers and to strip its

creator's ownership in the company that was created to market

financial products around the index.  The conspiracy involved

those hired by plaintiffs to develop the index, greedy investors

who were only too happy to join the plot with full knowledge that they would unlawfully be enriching themselves at plaintiffs' expense. Even the lawyer retained to represent plaintiffs' interests was part of the corrupt plot. The breaches of fiduciary and ethical duties here were staggering and it would be difficult to believe they occurred if plaintiffs didn't have the indisputable proof in emails that they did.

2.    Plaintiff William ZABIT had a brilliant idea that led to the creation of the first Index on Wall Street to use brand data and stock prices to pick undervalued stocks. It was eventually known as the BrandTransact 50 Index Powered by Wilshire (the "BTW50 Index"). Plaintiff BRANDTRANSACT WORLDWIDE ("BTWW") spent over five years refining the idea into a marketable reality, which consistently outperformed all major Wall Street indexes for the past ten years, including the S&P 500.

3.    ZABIT hired defendant Larry MEDIN as Chief Executive Officer of BrandTransact Investments ("BTI"), a company ZABIT envisioned to develop and to market financial products based on the BTW50 Index and other complementary indexes to be developed in the future. ZABIT and MEDIN formed BTI in 2015.

4.    BTWW launched the BTW50 Index on Wall Street on July 15, 2016. A year later, on June 13, 2017, BTI, by now renamed BRANDOMETRY, launched the Brand Value Exchange Traded Fund on the New York Stock Exchange (the "BVAL ETF"). The BVAL ETF tracked the BTW50 Index.

5.  MEDIN had always recognized the tremendous value
of the BTW50 Index and the BVAL ETF and decided to use his
trusted position as BTI's CEO to steal the company and its
assets.  Thus, soon after being hired in late 2015, he began
recruiting other defendants in a plot to do just that.

6.  One co-conspirator recruited by MEDIN was
defendant ZARABI.  He agreed to MEDIN's request to pose as an
"investor" who had insisted on a majority ownership and full
control of BTI in exchange for providing a $900,000 capital
investment.  In fact, ZARABI hadn't sought any type of majority
interest or control of BTI for a good reason:  his $900,000
wasn't a capital investment at all; almost all of it was a loan
that MEDIN had solicited.  MEDIN promised he would pay it back
with future investor contributions but he needed ZARABI to pose
as an investor to defraud ZABIT into agreeing to give up most of
his share of BTI.

7.  Fully aware of the fraudulent nature of ZARABI's
purported role as an investor seeking control of the company,
BTI's own lawyer, defendant BACON, flagrantly violated his duty
of loyalty to ZABIT, a client, by knowingly drafting a
Reorganization Agreement and Second Operating Agreement for BTI
that included the false statements labeling ZARABI as an
"investor" and reciting that ZARABI was making a "capital
contribution" to the company of $900,000.  BACON also dutifully
and knowingly documented the concocted and false condition that
ZABIT would have to relinquish 40% of his 54% stake in BTI for

ZARABI to invest.  MEDIN, ZARABI and BACON each knew that
ZARABI's funding was essentially just a short-term loan, yet each
corruptly agreed to misrepresent his funding as a capital
investment conditioned on ZARABI gaining full control of BTI.
All of this is fully documented in emails between MEDIN, ZARABI
and BACON that are in plaintiffs' possession.

8.   In an email from MEDIN to ZARABI on March 3, 2017,
MEDIN also describes how he planned to coerce ZABIT into agreeing
to the egregiously unfavorable terms that had been invented by
MEDIN, ZARABI and BACON.  MEDIN explained that ZABIT "responds
best to a 'ticking clock,' so I would like to push him for a
response" by a deadline that MEDIN himself had artificially set.

9.   Thus, with ZARABI's and BACON's knowledge and
consent, MEDIN sent ZABIT an email falsely stating that ZABIT had
no choice but to agree to ZARABI's supposed terms because, MEDIN
falsely claimed, his offer was "less than two hours away from
being withdrawn."  If it was withdrawn, MEDIN further and falsely
threatened, the result for ZABIT would "be a loss of everything,"
including $255,000 from ZABIT's youngest son's college tuition
fund, which ZABIT had loaned BTI to cover startup expenses.

10.   Because of his reliance on the combination of the
false representations in the documents his own lawyer had drafted
and MEDIN's false representations about a supposed two-hour
deadline, as well as MEDIN's equally false claims that the ZARABI
deal was the company's only hope of surviving, ZABIT reluctantly
signed the two agreements (although he did so "without

-4-

prejudice"). They reduced his ownership interest in BTI from 54% to 14%. A year later, in May 2018, using similarly deceptive and fraudulent tactics upon which ZABIT reasonably relied, MEDIN extinguished ZABIT's remaining ownership interest, literally leaving him with nothing.

11. Upon information and belief, most of ZABIT's original 54% ownership interest eventually ended up in MEDIN's own pocket after MEDIN used additional investor funds to pay back most of ZARABI's $900,000 loan.[1] In other words, the phony ZARABI "investment" scheme was simply a way for MEDIN to strip most of ZABIT's ownership interest in BTI away from ZABIT and, eventually, to usurp that ownership interest for himself.

12. Now firmly in control of BTI, MEDIN, ZARABI, BACON and the other defendants involved in the plot completed their coup by removing the BTW50 Index as the index tracked by the BVAL ETF. They replaced it with one they had created with the intellectual property stolen from BTWW--the algorithms and formulas that underlay the BTW50 Index.

13. All of the named, conspiring defendants had either signed non-disclosure agreements or became affiliates or consultants of BTI/BRANDOMETRY and, because of that, were prohibited from using the know how they had acquired about how

---

[1] In the end, as per his agreement with MEDIN, ZARABI allowed $125,000 of his loan to remain unpaid and to be deemed an investment. That was far less than the $900,000 MEDIN had falsely claimed ZARABI was investing. $125,000 was not enough by any stretch of the imagination to entitle ZARABI to a controlling interest in BTI.

the BTW50 Index worked for any purpose that was against the interests of BTI/BRANDOMETRY or plaintiffs. Yet, they plotted to create, and then by corruptly working together, used that confidential and protected information to create, their own copycat brand-based index, the EQM Brand Value Index (the "EQM Index").

14. Except for a trivial and cosmetic difference created solely to concoct a supposed difference between the two, the EQM Index was and is nothing other than a clone of the BTW50 Index, simply labeled with a different name. The EQM Index uses the same brand data from the same provider and the same algorithms that plaintiffs had developed and owned. Indeed, MEDIN plagiarized the very language ZABIT had originally drafted to describe the BTW50 Index and used it to describe the copycat EQM Index. All of this was done secretly, without the knowledge of ZABIT and BTWW.

15. On June 1, 2018, with their copycat EQM Index in hand, MEDIN and the other conspiring defendants simply dropped the BTW50 Index as the source of brand data for the BVAL ETF, and then had it track the copycat EQM Index instead. ZABIT and BTWW knew nothing about these unlawful violations of the non-disclosure agreements or of BTI's affiliates' and consultants' egregious breaches of their duties to have honest and fair dealings with, and to protect the trade secrets and confidences, of BTWW and BTI.

16.  MEDIN also enlisted the conspiratorial assistance of defendant BRIDWELL, the Chief Executive Officer of TENET PARTNERS, the entity that had been contracted to supply the critical brand data needed by the BTW50 Index.  MEDIN, BRIDWELL and TENET conspired to choke off BTWW's supply of TENET's data, with the intent of crippling the BTW50 Index.  Together, they used the trumped-up excuse that BTI couldn't make its minimum royalty payments to TENET--a pre-planned and contrived out that allowed TENET to terminate the agreement to provide brand data to BTWW and BTI as of June 1, 2018.

17.  Yet, a mere three weeks after BTI/BRANDOMETRY had informed TENET it couldn't make the minimum royalty payments to fund data for the BTW50 Index, BTI/BRANDOMETRY and TENET were back in business together, with TENET now supplying the same brand data to BTI/BRANDOMETRY to drive the copycat EQM Index.

18.  The otherwise inexplicable timing of the termination and reinstatement of the TENET agreement leaves no doubt that this was a coordinated, sham termination of TENET's agreement to provide data vital to the algorithm of the BTW50 Index.  It was done solely to further the plot to steal BTWW's intellectual property so the defendants could develop and operate a copycat index and use it, instead, to drive the BVAL ETF.

19.  Instead of the honest and fair dealings defendants owed plaintiffs ZABIT and BTWW, they methodically lied to and manipulated them.  They stole the trade secrets underlying the BTW50 Index and stripped ZABIT of his ownership of

BTI/BRANDOMETRY.  With their plot fully executed, MEDIN and other defendants now parasitically feed off the underlying technology and stand to be unjustly enriched at plaintiffs' expense.

20.  Their plot was sinister, calculated, morally-repugnant and blatantly unlawful, yet brilliantly executed.  This Court has the power to, and should, undo the defendants' fraudulent scheme, eliminate their opportunity to be unjustly enriched at plaintiffs' expense and should hold them liable for the damages they caused plaintiffs because of their unlawful plot and actions.

<u>PARTIES</u>

21.  Plaintiff BRANDTRANSACT WORLDWIDE, INC. ("BTWW"), is a corporation duly incorporated in 2013 under the laws of the State of Delaware, with offices located at 9111 Capistrano Street South, Unit 8302, Naples, Florida 34113.  BTWW is the developer and exclusive owner of the intellectual property known as the BrandTransact 50 Index, which is described more fully below.  During the relevant time periods described below, BTWW maintained an office at 48 Wall Street, Suite 1100 New York, New York 10005.

22.  Plaintiff WILLIAM ZABIT ("ZABIT") is a resident of the State of Florida, residing at 9111 Capistrano Street South, Unit 8302, Naples, Florida 34113.  ZABIT is BTWW's Founder and Chief Executive Officer.  During the relevant time periods described below, ZABIT maintained an office at 48 Wall Street, Suite 1100 New York, New York 10005.

23.  Defendant BRANDOMETRY LLC ("BRANDOMETRY") is a
limited liability corporation which was originally organized as
BrandTransact Investments, LLC ("BTI") under the laws of the
State of Delaware on September 14, 2015, and it currently has its
offices at 320 East 57th Street, Apartment 15A, New York, New
York 10022.  Up until June 2018, BRANDOMETRY was known as and
operated under the name of "BrandTransact Investments" and had
its offices at 48 Wall Street, Suite 1100, New York, New York
10005.

24.  Defendant BRANDOMETRY GROUP LLC ("BRANDOMETRY
GROUP"), is a limited liability corporation duly formed under the
laws of the State of Delaware.  Upon information and belief, it
maintains its offices at 320 East 57th Street, Apartment 15A, New
York, New York 10022.  Upon further information and belief,
defendants conduct some or all of the business of BRANDOMETRY
through BRANDOMETRY GROUP and they are alter egos of each other.
As noted above, in this complaint, BRANDOMETRY refers to
BRANDOMETRY LLC but each instance in which "BRANDOMETRY" is used,
it should be deemed to include BRANDOMETRY GROUP as well.

25.  Defendant LARRY A. MEDIN ("MEDIN") is the Chief
Executive Officer of BRANDOMETRY.  MEDIN is a resident of the
State of New York, residing at 320 East 57th Street, Apartment
15A, New York, New York 10022.

26.  Defendant LAM ASSOCIATES, INC. ("LAM") is a
corporation formed under the laws of the State of Delaware, with
offices located at 320 East 57th Street, Apartment 15A, New York,

New York, and 4018 Dixie Canyon Avenue, Sherman Oaks, California 91423. MEDIN is LAM'S founder and President.

27. Defendant SUSAN AVARDE ("AVARDE") is the Chief Strategist of BRANDOMETRY. AVARDE resides at 420 East 58th Street, Apartment 23BC, New York, New York 10022.

28. Defendant TONY WENZEL ("WENZEL") is the President of BRANDOMETRY. WENZEL resides at 834 84th Avenue, N.E., Medina, Washington 98039.

29. Defendant BRANDLOGIC CORP. ("BRANDLOGIC"), is a corporation duly incorporated under the laws of the State of Delaware, with offices at 122 West 27th Street, 9th Floor, New York, New York 10001, 20 Marshall Street, 1st Floor, Norwalk, Connecticut 06854 and 19 Cambridge Street, Rochester, New York 14607. BRANDLOGIC does business under the name of Tenet Partners. According to statements made by BRANDOMETRY, BRANDLOGIC is a BRANDOMETRY "affiliate partner."

30. Defendant COREBRAND ANALYTICS, LLC ("COREBRAND ANALYTICS"), is, on information and belief, a limited liability corporation duly formed under the laws of a state within the United States, with offices at 122 West 27th Street, 9th Floor, New York, New York 10001, 20 Marshall Street, 1st Floor, Norwalk, Connecticut 06854 and 19 Cambridge Street, Rochester, New York 14607. COREBRAND ANALYTICS does business under the name of Tenet Partners.

31. Defendant COREBRAND DATA SCIENCE ("COREBRAND DATA") is, on information and belief, a legal entity duly formed

under the laws of a state within the United States, with offices at 122 West 27th Street, 9th Floor, New York, New York 10001, 20 Marshall Street, 1st Floor, Norwalk, Connecticut 06854 and 19 Cambridge Street, Rochester, New York 14607.

32. Defendant TENET PARTNERS ("TENET PARTNERS" or "TENET") is, on information belief, a legal entity duly formed under the laws of a state within the United States, with offices at 122 West 27th Street, 9th Floor, New York, New York 10001, 20 Marshall Street, 1st Floor, Norwalk, Connecticut 06854 and 19 Cambridge Street, Rochester, New York 14607. According to TENET's website, BRANDLOGIC and COREBRAND ANALYTICS "joined forces" in 2014, and relaunched that combined entity as TENET PARTNERS. Upon further information and belief, defendants BRANDLOGIC, COREBRAND ANALYTICS, both already doing business under the name "Tenet Partners," COREBRAND DATA and TENET PARTNERS are all alter egos of each other. In each instance in which "TENET PARTNERS" or "TENET" is used in this complaint, it should be deemed to include BRANDLOGIC, COREBRAND ANALYTICS and COREBRAND DATA as well.

33. Defendant HAMPTON BRIDWELL ("BRIDWELL") is the Chief Executive Officer and Managing Partner of TENET PARTNERS and resides at 267 Black Rock Turnpike, Redding, Connecticut 6896-2103.

34. Defendant JAMES GREGORY ("GREGORY") is the Chairman of TENET PARTNERS and resides at 7408 Heritage Grand Place, Bradenton, Florida 34212.

35.   Defendant TOROSO INVESTMENTS ("TOROSO") is an investment management company and a BRANDOMETRY "affiliate partner."  It is headquartered at 115 West 29th Street, Suite 811, New York, New York 10001.  TOROSO also does business under the name of Tidal Growth Consultants.

36.   Defendant MICHAEL VENUTO ("VENUTO") is the Chief Investment officer of TOROSO.  Upon information and belief, VENUTO is a resident of the State of New Jersey.

37.   Defendant ACSI FUNDS ("ACSI") is an LLC with headquarters and offices located at 1001 Woodward Ave, Suite 500, Detroit, Michigan 48226.  "ACSI" is an abbreviation for American Customer Satisfaction Index.

38.   Defendant EXPONENTIAL ETFs ("EXPONENTIAL ETFs") is a sister entity of ACSI.  EXPONENTIAL ETFs also has its headquarters and offices located at 1001 Woodward Ave, Suite 500, Detroit, Michigan 48226.

39.   Defendant PHIL BAK ("BAK") is the Chief Executive Officer of both ACSI and EXPONENTIAL.  Upon information and belief, BAK is a resident of the State of Michigan.

40.   Defendant CHARLES A. RAGAUSS ("RAGAUSS") is the Director of Product Management at EXPONENTIAL and, upon information and belief, is a resident of the State of Michigan.

41.   Defendant EQM INDEXES LLC ("EQM") is a Limited Liability Corporation, with offices located at 10620 Treena Street, Suite 230, San Diego, California 92131.  EQM is also listed as a BRANDOMETRY "affiliate partner."

42. Defendant JANE EDMONDSON ("EDMONDSON") is the Co-Founder and Chief Executive Officer of EQM. Upon information and belief, EDMONDSON is a resident of the State of California.

43. Defendant FRANK ZARABI a/k/a Farhad M. Zarabi and Farhad Zarabi ("ZARABI") is a citizen of the State of California, and resides in Beverly Hills, California. ZARABI maintains an office at 5553-B Bandini Boulevard, Bell, California 90201, and positioned as the majority shareholder of BRANDOMETRY. ZARABI is also the Chief Executive Officer of Fam Brands LLC, and Rock Fit LLC and operates various other clothing and apparel businesses in the areas of manufacturing and wholesale distribution. He is also a developer/owner of hotels, multi-family and commercial real estate properties.

44. Defendant BACON LAW GROUP is a law firm that maintains its offices in the State of California and lists its mailing address at 1601 North Sepulveda Boulevard, No. 349, Manhattan Beach, California 90266. BACON LAW GROUP was retained by BTI to create various LLC agreements, amendments and contracts.

45. Defendant THOMAS C. BACON ("BACON") is the principal of the BACON LAW GROUP and is a citizen of the State of California. BACON maintains his offices in the State of California and lists his mailing address at 1601 North Sepulveda Boulevard, No. 349, Manhattan Beach, California 90266. Upon information and belief, BACON resides at 1705 Elm Avenue, Manhattan Beach, California 90266-5002.

<u>SUBJECT-MATTER JURISDICTION AND VENUE</u>

46. The Court has subject matter jurisdiction over the action pursuant to 18 U.S.C. § 1836(b), 28 U.S.C. §§ 1331, 1338 & 2201, as it involves substantial federal questions and claims arising under or related to the Defend Trade Secrets Act, unfair competition and theft and/or misappropriation of intellectual property ("IP").

47. It also has subject matter and supplemental jurisdiction over the related state-law claims pursuant to 28 U.S.C. §§ 1338 & 1367 because those claims form part of the same case or controversy as the federal claims.

48. Venue of this action is properly in this district, pursuant to 28 U.S.C. § 1391(b), on the grounds that a defendant may be found, has offices and conducts business in this district, and because substantial part of the events or omissions giving rise to the claims alleged herein occurred in this district.

<u>LONG-ARM JURISDICTION</u>

49. Upon information and belief, defendants have conducted, and currently conduct, business in the State of New York.

16. Upon information and belief, defendants derive substantial revenue from interstate commerce.

17. Defendants transacted business in this matter within the State of New York with plaintiffs and committed a tortious act within the State or a tortious act without the State that caused injury to plaintiffs within the State and expected or

should reasonably have expected the act to have consequences in the State.

19. Although ZABIT was not a resident of New York State, he made frequent visits there during the time periods specified below and participated in negotiations and meetings about the relevant events described below in New York City offices. Some of the false or misleading statements described below were made during these meetings.

18. During many of these meetings, those defendants who were located out of state participated in them telephonically while ZABIT was physically in New York City on the other end of the call. Each of the defendants in these calls, many of which were in furtherance of the wrongdoing described herein, participated in them knowing the unlawful conduct in which they were engaging or assisting would have consequences for ZABIT, who was physically present in New York City at the time of their unlawful conduct or the assistance they provided to others to engage in unlawful conduct. Each of the named defendants participated in such New York City meetings in which ZABIT was physically present in New York City.

20. Defendants knew that their actions would constitute a tortious act that they expected or should reasonably have expected would have consequences within the State of New York. Their tortious act did, in fact, have consequences within the State of New York.

BTWW's Development of the First Index to Use
Brand Data and Stock Prices to Pick Undervalued Stocks

50.   There are two primary types of investment funds
referred to as active and passive.  Actively managed funds have
investment managers or management teams that pick stocks or
securities that they expect will outperform their benchmark or
otherwise add value to the overall portfolio.  In contrast, in
passively managed funds, stocks are picked for a portfolio with
no human involvement in the investment decision-making process.
Instead, automated calculation methodologies based on individual
proprietary algorithms track an index and automatically select
stocks based on rules that define the selection process.  The
latest Wall Street trend favors passively managed funds versus
active investment fund management for a variety of reasons.

51.   Passive management is a style of management
associated with mutual and exchange-traded funds (ETFs) where a
fund's portfolio mirrors a market index, such as the S&P 500, the
Dow Jones Industrial or, with respect to the BVAL ETF here, the
BTW50 Index, the brand-based index developed by BTWW and ZABIT.

52.   The impetus for ZABIT's interest in starting BTWW
was a little-known statistic reported by consulting firm Ocean
Tomo that 84% of the value of the Fortune 500 companies was made
up of brand value and other intangible assets.  ZABIT realized
that most companies don't manage that huge factor because no one
knows how to identify it, to measure it or to valuate it.  So, he
concluded, companies ignore the massive value of intangible

assets and the impact these assets have on share price.  ZABIT
believed that this omission presented a prime opportunity to be
the first to create a firm that would help executives and
fiduciaries realize that the softer factors have a hard impact on
the current and future unrealized value of publicly traded
companies.

53.  ZABIT had the executive and entrepreneurial career
credentials that well positioned him to create BTWW, incorporated
in 2013, and BTI, formed in 2015, to develop his concept into a
marketable reality.  In his forty years of experience, ZABIT has
held positions as president and CEO of both private and publicly-
traded companies and held senior executive positions in
communications, branding and marketing companies.  ZABIT was also
a partner in one of the big-four accounting firms and was also a
principal and a national communications practice leader for one
of the largest consultancies in the world.

54.  ZABIT was invited three times to the White House
as a foremost national communications and brand expert to advise
the Clinton Administration on a matter of national import.  His
consulting client credentials also include Apple, American
Airlines, Chevron, CIGNA, Dell, FedEx, Fidelity, Intel, McKesson,
Microsoft, Nordstrom, Oracle, Pepsico, Pitney Bowes, Safeway,
Starbucks, Transamerica, United Airlines, Walmart, WellPoint,
Xerox and more.

55.  ZABIT founded and built Zabit & Associates in 1993
as one of the first fully integrated agencies that delivered

strategic, tactical and creative client services in branding, advertising, public relations, corporate communications, marketing communications, investment relations and employee communications to the largest companies in the world. Zabit & Associates was named among Inc. Magazine's 500 fastest growing companies in America and the company was later acquired by Worldwide Xceed. ZABIT became President of Worldwide Xceed, a NASDAQ Internet and marketing company. He was instrumental in developing the integrated model for Xceed that analysts validated as a new business sector for Wall Street. While he was president, Xceed went from OTC to NASDAQ listed and stock climbed from $6 per share to $48 per share in one year with the company's market cap reaching a billion dollars.

56. A year after BTWW was incorporated, ZABIT brought on William B. Bidlack as President and Chief Brand Strategist. Bidlack holds an M.B.A. from Stanford University and has had leadership roles with prominent consulting firms and brand agencies in the United States and abroad. The core business model for BTWW was based on value creation and risk mitigation with a specific focus on corporate and product brands, intellectual property, reputation of brand and leadership, human capital, talent and branded assets. BTWW remains the only single-source firm that exclusively has the ability to address the issues and opportunities related to this full complement of intangible assets and how they strategically and financially impact key lifecycle events a company faces.

57.  Beginning in 2014, ZABIT and Bidlack began development of a brand and intangible asset index with the goal of bringing validation to the tie between a company's brand and other intangible assets and a company's market cap.  ZABIT and Bidlack also brought Monny Sklov, Ph.D., a licensed securities broker, and economist Edgar Baum into the early development stages of the BrandTransact Index.  Both became BTWW associates. Sklov became the head of Analytics for BTWW.  Baum became a BTWW affiliate partner.

58.  To validate the concept, in March of 2015, ZABIT contacted Dr. Rob Shapiro, who had written an article monetizing the 2011 value of the intangibles assets of the Fortune 500 companies, primarily by subtracting a company's book value from its market cap to determine the value of intangible assets. Shapiro holds a master's degree and a Ph.D. from Harvard and a master's degree from the London School of Economics.  He is a former United States Undersecretary of Commerce, a global economist, and is known as an intangible asset economist and consultant.

59.  After reviewing the business description and marketing materials for BTWW, Shapiro immediately sought participation and signed on as BTWW's Chief Strategy Officer. Rounding out the BTWW team was a consortium of the world's top experts representing each of the BTWW intangible asset categories.

60.  In March of 2015, ZABIT and Bidlack met with
Schapiro at his offices in Washington, D.C., and shared the brand
index concept with him.  ZABIT and Bidlack traveled to New York
City the next day for a meeting with defendant MEDIN, an
acquaintance and former occasional business associate of ZABIT.
The purpose of the two-hour meeting in March 2015 was to
introduce BTWW's concept for an investible index on brand and
intangible assets and to gauge the interest of TOROSO, an
investment management company, in building financial products
based on the BTW50 index concept.

61.  MEDIN, who was a co-founder, part-owner and, at
the time, Chief Executive Officer of TOROSO, was extremely
impressed with the idea of the potential to create Exchange
Traded Fund ("ETF") products based on the BTWW index concept.  He
recommended that ZABIT and the others meet with his colleague at
TOROSO, defendant VENUTO, who was a co-founder, owner and Chief
Investment Officer of the company.  VENUTO, a well-known global
expert on ETF's, told ZABIT and Bidlack, after their
presentation, that he believed there was the potential for
multiple ETFs based on the brand and intangible asset index
concept from BTWW that was introduced to VENUTO.  MEDIN was also
present at the subsequent two-hour presentation meeting with
VENUTO in April 2015.

62.  Other meetings with TOROSO followed as MEDIN and
VENUTO were hired as consultants.  MEDIN who was hired as an
advisory consultant to BTI was on the development team for the

-20-

BTW50 Index.  VENUTO was hired as a consultant by both BTI and
BTWW to perform calculation modeling and optimization scenarios
for the index.  Prior to each meeting, MEDIN and ZABIT signed
mutual non-disclosure agreements ("NDA's").  VENUTO and ZABIT
signed a separate NDA.  MEDIN also signed a mutual NDA through
LAM, his consulting firm.  MEDIN, for reasons unknown, was
removed as CEO of TOROSO by the direction of the Board on August
28, 2015.

        63.  Eventually, the BTWW Index development team
included ZABIT, Bidlack, Sklov, Shapiro, Baum from BTWW, and
independent consultants MEDIN and VENUTO.

        64.  In May of 2015, using publicly-available brand
data from Brand Finance, a company headquartered in London,
England, BTWW created a trial version of the BTW50 Index.  The
proprietary algorithm calculated the spread between a company's
brand value and its stock price to identify stocks with
unrealized value.  When a company's brand value through
relational analysis was higher than its stock price, it indicated
the potential for market expansion and that a resulting rise in
stock price was likely.  With this scenario, the larger the
spread between brand score and stock price, the greater the
unrealized value in that company's stock.

        65.  Through this methodology, the BTW50 Index created
(and the current, pirated clone, the EQM Index still creates) its
investment portfolio by picking the fifty stocks with the
greatest delta between the brand value and stock price in a

relational comparison.  The portfolio is recalculated or "rebalanced" annually based on updated stock prices and brand data.  With the annual rebalancing, some stocks stay in the BTW50 portfolio, some rotate out and others rotate in.

66.  In June of 2015, FTSE Russel's management team was impressed with the performance of the index and invited BTWW to test its Index against the FTSE Russel 1000. FTSE Russell is the leading provider of Indexes in the world.

67.  Testing various performance scenarios, BTWW was able to achieve performance levels that significantly and historically outperformed every other stock index, including the Dow Jones Industrial Average, the S&P 500, the FTSE Russell 1000, the FTSE Russell 2000, the Wilshire 5000, the Wilshire Large Cap indexes and the Guggenheim S&P 500 Equal Weight.

## Creation of BrandTransact Investments

68.  In July 2015, with this developing momentum and the reality of launching the BTW50 Index becoming increasingly likely, ZABIT decided to create an entirely separate company, BrandTransact Investments ("BTI") to develop investment products using the BTW50 Index and invited MEDIN to be its Chief Executive Officer.  MEDIN wanted a fifty-percent equity stake in it, arguing that he was bringing "$460,000 worth of consulting services from TOROSO to the table."  Eventually, the parties settled on a 54%/46% split, with ZABIT having the majority interest as would be expected as it was he who had introduced the brand and intangible asset index concept to MEDIN.

-22-

69.  ZABIT told MEDIN he would have his certified public accountant create BTI as a limited liability corporation but MEDIN strenuously objected, insisting that he would file for the LLC certificate himself, explaining he "had a lot of experience doing so."  MEDIN created the BTI LLC under Delaware law in September of 2015.  Contrary to the agreement he had reached with MEDIN, however, when ZABIT saw a copy of the LLC filings, he was surprised to see that MEDIN had listed himself as the sole member of BTI, with no indication of ZABIT's majority ownership or of any ZABIT membership whatsoever.  Despite ZABIT's persistence in requesting MEDIN to correct that by creating an actual operating agreement, it took more than a year for MEDIN to do that.

The First Operating and Licensing
Agreement of BTI and BTI's Exclusive License
<u>to Use the BTW50 Index to Develop Financial Products</u>

70.  On December 1, 2016, MEDIN and ZABIT signed a Limited Liability Company Operating Agreement structuring BTI (the "First Operating Agreement").  The First Operating Agreement recited the initial contributions of its only two members, ZABIT and MEDIN.  ZABIT, through BTWW, was listed as contributing an exclusive license agreement to BTI that was valued at $540,000. MEDIN was listed as contributing a consulting agreement with TOROSO that was valued at $460,000.  The total of the two recited contributions was $1,000,000.  The First Operating Agreement set forth the ownership interests and responsibilities of both

partners.  As agreed, ZABIT was given a 54% ownership interest.
MEDIN was given a 46% ownership interest.

72.    MEDIN was designated as "Managing Member" of BTI,
responsible for the management of its business.  The First
Operating Agreement generally conferred on MEDIN "all rights and
powers generally conferred by law or necessary, advisable or
consistent in connection therewith,"  First Operating Agreement
¶ 9.1, to carry out his responsibilities.  But the agreement
established some limitations on MEDIN's authority.

72.    For example, it required MEDIN to obtain the
approval of a supermajority of the members to make a major
disposition of company assets, to engage in any significant
financing or capital transactions, to pledge any company assets
as security, to make a material change in the nature or operation
of the company, to incur any indebtedness over $50,000, to create
any liens on the company's assets, to issue any equity interests
of the company, to acquire any equity, to pay any annual
compensation above $100,000, to expend more than $10,000 in cash,
to amend the First Operating Agreement or to cause the
dissolution or winding up of the company.  As is explained below,
MEDIN did not abide by these limitations when he discussed terms
with defendant ZARABI about a capital raise and an equity
position and when he actually agreed to provide him with such an
equity position.

73.    Of critical importance here, the First Operating
Agreement specifically provided that "no Member shall be required

to make any additional Contributions or loans to the Company."
First Operating Agreement ¶ 6.2 (emphasis added).

74.   On December 1, 2016, BTI and ZABIT signed an
agreement setting out the terms of loans ZABIT had already made,
and expected to continue to make going forward, to BTI.   Under
that agreement, those loans would all be due and payable upon
"the occurrence of a Capital Event involving [BTI]."

75.   The First Operating Agreement acknowledged that
ZABIT had already loaned, and might in the future continue to
loan, money to BTI to fund its ongoing expenses.   It provided
that if ZABIT were unable or unwilling to make future loans, any
other member of BTI could loan it money with the consent of a
supermajority of the members, which the First Operating Agreement
defined as 67% of the participation percentages.   All such loans
were to be repaid before either ZABIT or MEDIN were paid more
than $5,000 per month.

76.   Under the First Operating Agreement, if BTI were
to raise capital through equity or debt, or to dissolve the LLC,
the assets were to be distributed first to repay the outstanding
loans of ZABIT before using funds for any other purposes
including operating capital, liquidation, to pay company debts or
to distribute remaining proceeds to the members.

77.   Also of critical importance here, the First
Operating Agreement stated that all loans by members, including
those of ZABIT, "shall not be considered Contributions for
purposes of this Agreement, increase such Member's Capital

-25-

Account or entitle such Member to any greater share of the Profits, Losses or distributions of the Company than such Member is otherwise entitled to under this Agreement."  First Operating Agreement ¶ 6.5.  It further stated that "[n]o loan shall be made by a Member to the Company unless approved by the Members."

78.  The First Operating Agreement also barred, for a two-year period, any member who transferred "their entire Membership Interest, whether voluntary, involuntary, by operation of law, or by reason of any provision in this Agreement," First Operating Agreement ¶ 21.1, from hiring, taking away or attempting to do the same with respect to any company employees or former employees, or from inducing or influencing, or seeking to induce or to influence, any person engaged by BTI as an employees, agent, independent contractor, or otherwise, to terminate their relationship with BTI.

79.  It also prohibited members whose membership interests had been transferred during the same two-year period from disclosing any "Confidential Information" of the company, which it defined as "all trade secrets, 'know-how,' menu items, customer lists, pricing policies, operational methods, programs, and other business information of the Company created, developed, produced or otherwise arising before the date of the Transfer." First Operating Agreement ¶ 21.1(c).

80.  The First Operating Agreement stated that no member "shall own, operate, manage, advise or otherwise perform services of any exchange traded fund or similar fund other than

those operated by the Company."  First Operating Agreement ¶ 21.2.

81.  The First Operating Agreement also provided that any breach of a material provision in it would entitle the other parties to equitable relief, because the rights granted to the parties under it were of "a special and unique kind of character," First Operating Agreement ¶ 17, and, therefore, "the other parties would not have an adequate remedy at law," <u>id</u>.  The First Operating Agreement provided that the rights of the parties to the agreement could be enforced through equitable relief.  <u>Id</u>.

82.  The First Operating Agreement provided that the prevailing party in any action or proceeding, whether legal or equitable in nature, shall be entitled to recover from the losing party its reasonable attorneys' fees and costs.  First Operating Agreement ¶ 20.

83.   On the same day that MEDIN and ZABIT signed the First Operating Agreement, BTWW and BTI also entered into a licensing agreement under which BTWW granted BTI an exclusive, perpetual royalty-free license to use the BTW50 Index to develop financial products.  These included the BVAL ETF (exchange traded fund), which was eventually listed on the New York Stock Exchange.  This type of license was a natural result of the fact that ZABIT owned the majority of both BTWW and BTI.

84.  MEDIN, acting in concert with, and aided and abetted by, the other defendants, never intended to comply with the provisions in the First Operating Agreement or a Second

Operating Agreement defined and discussed below and, instead, fraudulently induced ZABIT to enter into both.

The Tri-Agreement and the
"Out Clause" Malevolently Inserted in it

85.   In the months leading up to the signing of the First Operating Agreement, the BTWW team continued to develop the BTW50 Index.  In November 2015, BTWW's effort to negotiate the ongoing use of the London-based Brand Finance's data failed and FTSE Russell's business priorities changed, so they weren't interested in having any type of ongoing relationship either. That made the prospect of creating the BTW50 Index appear very dim and MEDIN, BTI's CEO, was ready to give up.  ZABIT, however, was determined to persevere and he approached economist Edgar Baum to seek his recommendation for a viable brand data provider as an alternative to Brand Finance.

86.   Baum suggested TENET, a widely-recognized authority on brand measurement and valuation, which uses a highly stable, quantitative benchmark tracking system with a proprietary model correlating corporate brand to market capitalization. TENET has been compiling quarterly brand data for United States companies consistently since 1994.

87.   ZABIT contacted TENET's CEO, defendant BRIDWELL. They met on November 11, 2015, to discuss the prospect of TENET providing the brand data.  ZABIT pitched TENET for the exclusive use of its brand data.  Also attending that meeting representing BTWW were Edgar Baum, Bidlack and Dr. Monny Sklov (by phone). MEDIN, in his consulting capacity of CEO of BTI, and VENUTO, as

-28-

consultant to BTWW and BTI, were also participants in the discussion. Attending from TENET's side were BRIDWELL and two other TENET associates. Shortly after the meeting, which had concerned general marketing concepts but no sharing of proprietary information or trade secrets, BRIDWELL initialed and then, a few days after that, signed a full mutual NDA on behalf of TENET.

88. On February 15, 2016, after mutual due diligence, and several rounds of negotiations, TENET, BTI and BTWW finalized a Licensing and Royalty Agreement they called the Tri-Agreement. The Tri-Agreement was signed by BRIDWELL on behalf of TENET, MEDIN on behalf of BTI, and ZABIT on behalf of BTWW. At this point, TENET was analyzing and providing brand data on more than 1,000 United States publicly-traded companies. Access to such data was and is essential to the algorithm that was used to calculate the BTW50 Index and to perform its annual rebalancing. Without access to this data, the BTW50 Index could not exist.

89. In the Tri-Agreement, TENET granted BTWW and the BTW50 Index the exclusive use of its brand data for BTW50 Index and other complementary (not competitive) indexes BTI would introduce. It also agreed not to provide its data to any other entity that was directly competing with the BTW50 Index that BTWW was creating with TENET's data.

90. It later became abundantly clear that MEDIN was, even at that early stage, actively laying the foundation to take control of BTI and to wrest the technology underlying the BTW50

Index, and the BVAL ETF, away from ZABIT and BTWW. Thus, while negotiating the Tri-Agreement, MEDIN specifically planted in it a provision he planned to use later to cut plaintiffs completely out of the picture. Upon information and belief, MEDIN shared that plan with BRIDWELL prior to BRIDWELL signing the Tri-Agreement and BRIDWELL agreed to help carry it out when the time came to do so.

91. Specifically, in section six of the Tri-Agreement, MEDIN and BRIDWELL malevolently inserted an out-clause that would become a critical part of their conspiratorial plot:

> Minimum Royalty: Tenet has the right to terminate this Agreement if BTI does not pay minimum yearly royalties of $100,000 or 20% of BTI gross revenues, whichever is greater.

Upon information and belief, MEDIN and BRIDWELL agreed that when the time came to implement the plan to eliminate plaintiffs, BRIDWELL and TENET would aid MEDIN in carrying it out.

92. Specifically, upon information and belief, MEDIN and BRIDWELL agreed that when MEDIN made the pre-planned notification that BTI would not make the minimum payment, BRIDWELL and TENET would use that as a pretext to terminate TENET's agreement to provide the critical brand data to BTWW and BTI. Upon information and belief, they further and corruptly agreed that neither BTI nor TENET would take any steps to renegotiate the minimum royalty payment when that occurred, even if it would make obvious business sense to do so. That would provide TENET a manufactured excuse to cancel its agreement to provide the brand data that was essential to the BTW50 Index.

93.   The net result of all this scheming was that MEDIN gave himself the unilateral power, and secured a promise from TENET for complicit assistance, to choke off the very data that his company, the BTW50 Index and the BVAL ETF would all need to survive.  As alleged in fuller detail below, when the two executed their plan two years' later, and TENET choked off the supply of brand data, it crippled BTWW and BTI as planned.

94.   BTI's eventual notice to TENET that it could not make the minimum payment set in motion a chain of events orchestrated by the defendants that eventually stripped ZABIT's entire ownership interest in BTI and eliminated BTI's use of the BTW50 Index, paving the way for the defendants to bring their own copycat index, the EQM Index, into the picture--an index created with misappropriated trade secrets and through breaches of their non-disclosure agreements and violations of the duties arising from their relationships as affiliates of or consultants to BTI.

95.   In any event, shortly after the Tri-Agreement was signed, a services agreement was signed between Wilshire Associates and BTWW on March 31, 2016.  Michael Kennedy, Managing Director of Wilshire Analytics, signed on its behalf and ZABIT signed on behalf of BTWW.  The agreement outlined a commitment from Wilshire to support the BTW50 Index.  Wilshire's services included publishing the index and its current and historical performance to all significant Wall Street entities, and optimizing, calculating and rebalancing the BTW50 Index on an

annual basis.  The Wilshire name brought additional credibility and prestige to the BVAL ETF.

96.  According to the Licensing and Royalty Agreement between BTWW and BTI, whereby BTWW had granted BTI an exclusive, perpetual and royalty-free usage of the BTW50 Index, BTWW would pay the Wilshire quarterly fees for services, and BTI agreed to reimburse BTWW for those fees paid.

<u>The Other Defendants Join the Conspiracy</u>

97.  On information and belief, MEDIN informed each of the other named defendants of his plan to steal the BTW50 algorithms and to divest ZABIT entirely of his ownership interest in BTI.  MEDIN explained that they could all do that by working together to steal the technology underlying the BTW50 Index and to use it to create an identical index that the rogue group would own and use and that they could then similarly steal ZABIT's company, BTI, out from under him.

98.  Upon information and belief, each defendant independently agreed to assist in the plot and did assist it, in their own manner, as BRIDWELL had already agreed to do on behalf of TENET.  Each also had the knowledge and experience in the industry to know full well that they were being recruited into an unlawful plot that could unlawfully enrich them only at ZABIT's expense.

99.  For example, emails obtained by plaintiffs reveal that MEDIN was secretly recruiting defendants WENZEL and AVARDE into the plot as early as November of 2015, having discussions

about the plot and also about their participation as equity partners in BTI, sharing insider and confidential information with them, all while ZABIT was still a majority owner of BTI and personally funding the startup of the company.

100. ZABIT had no knowledge of this activity, all of which violated MEDIN's and the other defendants' fiduciary duties to, and duties of honesty and fair dealing with, plaintiffs, as well as their agreement not to use or to disclose trade secrets with which they had been entrusted based on their signing non-disclosure agreements with, and/or their affiliation with, or retention as consultants to, BTI.

101. MEDIN's recruitment promises were effective, as WENZEL and AVARDE both became members of the BRANDOMETRY executive team when MEDIN began operating BTI with the new name of "BRANDOMETRY."  WENZEL became BRANDOMETRY'S President and AVARDE became its Chief Strategist.  Their direct involvements as executive leaders made them both knowledgeable about the proprietary algorithm underlying the BTW50 Index, as well as all binding agreements among BTI, BTWW, TENET and Wilshire Associates.

102. WENZEL has more than twenty years' experience as a business leader with a track record of success in fast-growing analytics, e-commerce, what WENZEL describes in his current online biography as "I.O.T.," video media systems, and brand econometrics technology firms.  He founded two companies

emphasizing the power of brand as an intangible asset and source of value and holds an M.B.A. with emphasis in finance.

103. As the former head of global brand for Citigroup, AVARDE oversaw brand operations in more than one hundred countries.  She also serves on various advisory boards in the United States, Canada and the United Kingdom for venture capital and service firms leveraging A.I., media-tech, marketing analytics and brand econometrics to drive growth.

104. Therefore, both WENZEL and AVARDE had the experience and business sophistication to know full well the wrongful nature of the plot they had willingly joined.

105. Upon information and belief, all the named defendants were offered, and eventually received, equity stakes in BTI in exchange for their participation in the successful plot to steal the intellectual property and trade secrets of BTWW and wrongfully to strip ZABIT of his ownership interests in BTI.

106. Upon information and belief, all of those offered and given such equity positions knew that ZABIT owned 54% of BTI and that his ownership share would have to be reduced or eliminated to free up equity for them.  It was to obtain that equity, among other reasons, that the defendants agreed to participate, and participated, in the successful scheme to accomplish both ends.

107. MEDIN, EDMONDSON, GREGORY, VENUTO and BAK were also made original and continuous members of the BTW50 Index Committee (the "Index Committee"), an informed and

decision-making group on all matters pertaining to the BTW50 Index, which the BVAL ETF legitimately tracked.

108. MEDIN was intimately knowledgeable about every aspect of the underlying proprietary algorithm for the BTW50 Index and all binding agreements among BTWW, BTI, TENET and Wilshire Associates.

109. EQM, headed by EDMONDSON, creates and supports innovative indexes that track growth industries and emerging investment themes. The company's index design expertise spans a wide range of asset classes and financial instruments.

110. EDMONDSON is a former institutional portfolio manager with more than twenty-five years in the investment industry. She is not only a member of the Index Committee; she is also its Chair. Her participation as the executive-in-charge of EQM, which eventually created the cloned, copycat EQM Index, plus her involvement as a member and Chair of the Index Committee, made her knowledgeable of every aspect of the underlying algorithm for the BTW50 Index and of all binding agreements among BTI, BTWW, TENET and Wilshire Associates.

111. GREGORY is a founding member of the Marketing Accountability Standards Advisory Council ("MASAC") and is a member of the Marketing Accountability Standards Board ("MASB"), where he is the co-chair of the Improving Financial Reporting Committee. He is a leading expert on the quantifying of brand value.

112.  GREGORY developed the CoreBrand Index ten years ago to determine the "Top 100 Most Powerful Brands" based on high awareness and positive brand perceptions.  The CoreBrand Index currently analyzes over 1,000 publicly traded companies in the United States.  In addition to being a member of the Index Committee, GREGORY's participation as the Chairman of TENET and his advisory involvement with the BTW50 Index development team made him intimately knowledgeable about every aspect of the algorithm underlying the BTW50 Index and of all binding agreements among BTWW, BTI, TENET and Wilshire Associates.

113.  BRIDWELL has over 17 years of experience in corporate brand identity and marketing communications.  He has provided the strategic direction for the development and implementation of identity systems, brand management and corporate communications for clients such as Amgen, an entity TENET's website refers to as "BD," CenterLight, Engelhard, IBM, Merck, Texaco, Wyeth and Xerox.

114. BRIDWELL was intimately knowledgeable about every aspect of the algorithm underlying the BTW50 Index and of all binding agreements among BTWW, BTI, TENET and Wilshire Associates.  Although not a member of the Index Committee, BRIDWELL was the Chief Executive Officer and Managing Partner of TENET, participated in the negotiation of the Tri-Agreement, advised the BTW50 Index development team, and was directly involved in the process of providing annual TENET brand data for the rebalancing of the BTW50 Index.  It was his eventual decision

to stop providing brand data to BTWW and BTI and then to reinstitute doing that with the very same BTI (by then renamed BRANDOMETRY) only three weeks later, to supply data for the conspirators' copycat product.

115. TOROSO is an investment management company registered with the SEC as a Registered Investment Advisor ("RIA") specializing in ETF-focused research, investment strategies and services designed for financial advisors, RIAs, family offices and investment managers.

116. VENUTO, TOROSO's Chief Investment Officer, is a member of the BTI/BRANDOMETRY Index Committee. He was intimately knowledgeable about every aspect of the underlying algorithm for the BTW50 Index and about all binding agreements among BTWW, BTI, TENET and Wilshire Associates. In addition, VENUTO participated as a hired consultant to perform calculation modeling and optimization scenarios for the BTW50 Index and acted as an advisor with the BTW50 Index development team.

117. ACSI, headed by BAK, is the only national cross-industry measure of customer satisfaction in the United States. The ACSI Core Alpha ETF tracks an index of United States listed large-cap companies, weighted toward those with high customer satisfaction scores from surveys. ACSI is one of BRANDOMETRY's "affiliate partners" and played a large part in launching the BVAL ETF on the New York Stock Exchange.

118. EXPONENTIAL ETFs, also headed by BAK, delivers new and novel outcomes for investors with ETFs built and managed

using the industry's best practices, overseen by an experienced product management team and an industry leading capital markets infrastructure.  EXPONENTIAL ETFs is also a BRANDOMETRY "affiliate partner" and similarly played a large part in launching the Brand Value ETF on the New York Stock Exchange.

119. BAK himself is a member of the Index Committee. In addition, BAK's participation as the executive-in-charge for both ACSI and EXPONENTIAL made him intimately knowledgeable about every aspect of the underlying algorithm for the BTW50 Index and of all binding agreements among BTWW, BTI, TENET and Wilshire Associates.

120. RAGAUSS served as Director-in-Charge of BTI's ETF product management, with a hands-on role in the day-to-day process and management of the BVAL ETF and the underlying BTW50 Index.  He was also the liaison between BTI, TENET and Wilshire. His direct involvement in those roles, and his role in coordinating the annual index rebalancing process among TENET, BTI, BTWW, Wilshire Associates and EXPONENTIAL ETFs, made him intimately knowledgeable about the underlying, proprietary algorithm of the BTW50 Index and all binding agreements among BTWW, BTI, TENET and Wilshire Associates.

121. ZARABI and BACON, BTI's and ZABIT's lawyer, were both familiar with the binding agreements among BTWW, BTI, TENET and Wilshire Associates.  They were recruited to help the other defendants violate and circumvent those agreements and, accordingly, were fully knowledgeable about, and substantially

-38-

and intentionally assisted, the unlawful efforts of defendants to steal the BTW50's underlying algorithms and to strip ZABIT of his ownership interests in BTI.

122. Notwithstanding their individual and collective knowledge about the underlying, proprietary algorithm for the BTW50 Index and all binding agreements among BTWW, BTI, TENET and Wilshire Associates, the defendants nevertheless created the copycat EQM Index. Cooperation from TENET provided MEDIN with illicit access to its brand data to help MEDIN and the other defendants create an index that would replace the BTW50 Index. They used their insider knowledge of the BTW50 Index formula to work covertly with EQM, TENET, ACSI, EXPONENTIAL ETFs, BRANDOMETRY and TOROSO to create and to test the EQM Index, which would eventually become a cloned replacement of the BTW50 Index.

123. They did so while the BTW50 Index was actively being used to support the BVAL ETF and while binding agreements were in place to protect the confidentiality of the BTW50 Index intellectual property and trade secrets. Each was fully knowledgeable that their actions constituted breaches of the non-disclosure agreements they had signed and of the existence and terms of the agreements between BTI, BTWW and ZABIT. Each of the defendants knowingly and intentionally participated in the plot to steal both the BTW50 algorithms and ZABIT's ownership interests in BTI.

124. All of the defendants were aware of and participated in a calculated series of events orchestrated by

MEDIN that would lead to the simultaneous and fraudulent termination of multiple contracts among and between BTWW, BRANDOMETRY, Wilshire Associates and TENET.  In a series of covert and incriminating email exchanges in plaintiffs' possession, the defendants corruptly plotted behind ZABIT's back to use that process to cut him and BTWW out of the picture.  All of this occurred while ZABIT was still the majority owner of BTI.

125. MEDIN, BTI's Chief Executive Officer, had fiduciary and other types of duties to deal with ZABIT openly and honestly and to protect ZABIT's interests in the BTW50 Index and BTI.  In the following email between MEDIN and BRIDWELL, on January 17, 2017, at 11:28 p.m., however, MEDIN wanted to keep his conspiratorial plotting with BRIDWELL, a company outsider, from ZABIT.

Hampton,

Bill [ZABIT] shared at lunch today, that he is planning to meet with you while he is in NYC.  If that happens, I would appreciate that our conversation be kept confidential.

All the Best,

Larry

BRIDWELL responded "Of course."

The Conspiring Defendants' Plan to Use a Phony "Investor" to
Manipulate ZABIT Into Relinquishing His Majority Interest of BTI

126. By late 2016, BTI needed additional working capital.  ZABIT told MEDIN he would try to court new investors and MEDIN said he would do the same.  While ZABIT's efforts were legitimate, MEDIN's were not.  He recognized that the need for

capital provided the perfect opportunity to rid BTI of ZABIT and to usurp ZABIT's brainchild for himself.

127. ZABIT was consistent that the personal loans he had been making to keep BTI afloat, including $255,000 from his son's college fund, had to be paid off with the first raise of capital through equity or debt, as provided for in the First Operating Agreement. MEDIN, however, decided to use ZABIT's need to get his loans repaid against him, forcing him to give up his majority interest as a condition of that happening.

128. MEDIN did that by finding a corrupt partner who would be willing to pose as an investor and to allow MEDIN to claim falsely that the partner was conditioning his investment on acquiring a controlling interest in BTI. This successful scheme eventually resulted in ZABIT relinquishing all of his equity in BTI. That willing partner turned out to be defendant ZARABI, a wealthy employer of MEDIN's daughter.

129. In a revealing email to BAK on February 20, 2017, MEDIN candidly explained that MEDIN's brazen goal was to steal the value of the BTW50 Index from ZABIT's company, BTWW, and to migrate it to BTI, the company over which MEDIN had operational control:

> This is the agreement for the BTW50 index. This agreement is between BTWW (Bill Zabit's consulting business) and Wilshire. BTI has a perpetual, exclusive, royalty free licensing agreement to use the index for the creation of financial products and services.
>
> This basically strips the value of the index out of BTWW and into BTI.

(emphasis added).

130. A week later, MEDIN shared his corrupt plan with another willing coconspirator, BRIDWELL. In an email on February 27, 2017, MEDIN asked BRIDWELL to confirm that he was still willing to carry through with the plot the two had hatched a year earlier when they drafted the Tri-Agreement:

> I met with a billionaire in LA last week and he is sending me an offer to buy out Bill and fund the business going forward. I just wanted to <u>reaffirm</u> that Tenet will support the index if we have a "change of control" in BTI. . . . He wanted to make sure we were secure in the Tenet relationship, before the offer is made to Bill. We can discuss more tomorrow. But an indication of support would allow me to move on this today.

(emphasis added).

BRIDWELL quickly emailed back that he could still be counted on to remain in the plot, "reaffirming" that "[w]e are in support of the changes proposed."

131. MEDIN then replied to BRIDWELL again and provided more specifics about the plan going forward: ZARABI would falsely be posing as a full $900,000 equity investor--when he would, in reality, be a mere lender except for a relatively modest investment of $125,000. Upon information and belief, BRIDWELL knew the representation that would be made to ZABIT about ZARABI investing $900,000 was false. MEDIN explained that he would leverage this concocted story to force ZABIT to give up his majority interest in BTI, clearing the way for others such as BRIDWELL and defendant WENZEL to be awarded shares of the equity that MEDIN would strip away from ZABIT:

-42-

In short, it is my daughter's boss. In addition to his
apparel business, he has a very large real estate
business including a number of very high end hotels in
LA.

The idea would be to have him buyout Bill, get
everything stable financially, and then do a secondary
cap-raise that would mostly take him out. <u>This would
give me the ability to bring in you and others who are
more directly related to our business, including Tony
[WENZEL] and some others.</u>

(emphasis added).

132. In a March 13, 2017, email to his tax lawyer at
the New York office of the Philadelphia-based Fox Rothschild law
firm, MEDIN confirmed that the supposed "investor," Frank ZARABI,
was, in reality, a mere lender, who "expected that he will
receive most of his money back" when MEDIN did an anticipated
additional round of financing. Plaintiffs have a copy of this
emailed admission that ZARABI's role was being misrepresented to
ZABIT.

133. In the dark about all of this, ZABIT had been
developing serious interest from several, legitimate investors.
MEDIN, however, did everything possible to sabotage those
efforts. He never responded to requests to participate in
meetings with potential investors ZABIT had lined up, for example
and for good reason. After all, MEDIN already and secretly lined
up his preferred phony investor, ZARABI. On February 28, 2017,
MEDIN groundlessly dismissed the opportunity for a meeting with
Fidelity Investments that ZABIT had scheduled with Brian Hogan,
President of Global Manufacturing for Fidelity, after Fidelity
had expressed interest in discussing business options.

-43-

134. MEDIN also dragged his feet for about a month before producing financial performance and projections that ZABIT's potential investors had been requesting. When he finally provided them to ZABIT on February 25, 2017, they falsely projected only meager revenues and projections. Remarkably, only a day earlier, MEDIN had emailed ZARABI final deal terms, which included projections that were diametrically opposite, with extremely positive and accurate projected revenues and market valuations. Plaintiffs have copies in their possession of these utterly inconsistent emails and projections prepared by MEDIN.

135. With a combination of delay, lack of cooperation and, finally, threats, MEDIN successfully blocked ZABIT's efforts to find legitimate investors and manipulated ZABIT into agreeing, in principle, to bring MEDIN's still unnamed investor (ZARABI) into the company for a majority share of the company. MEDIN then began the process of formalizing his corrupt deal with ZARABI.

The Reorganization and Second Operating Agreements:
Stripping ZABIT of His Majority Interest in BTI

136. MEDIN asked BTI's attorneys, defendants BACON and the BACON LAW GROUP, to draft Reorganization and Second Operating Agreements, which would restructure BTI to account for the new "investment." The purpose of the both was, ostensibly, to add the new "$900,000-investor" ZARABI as a new member of the LLC. Unbeknownst to ZABIT, however, their creation was also one of the critical steps in the plot hatched by MEDIN and the other defendants, including ZARABI, to wrest the value of the BTW50

-44-

Index and all of ZABIT's ownership interest in BTI and the BVAL ETF away from him.

137. BACON and the BACON LAW GROUP had been retained by BTI to represent the interests of its LLC members, which included ZABIT as the majority owner.  As such, they had a duty of loyalty and a fiduciary duty to ZABIT, and to deal with him fairly and honestly.  They violated and breached those duties by virtue of their participation in the plot to oust ZABIT from BTI and to steal the algorithms underlying the BTW50 Index.

138. BACON had full knowledge of the fraudulent nature of the plot to portray ZARABI as an investor and the corrupt intentions of MEDIN and the other defendants.  Unbeknownst to ZABIT, BACON acted upon MEDIN's emailed request to refer falsely to ZARABI in the Reorganization and Second Operating Agreements as an investor of $900,000 and a 54% majority owner of BTI. MEDIN also told ZARABI and BACON he was going to misrepresent ZARABI this way to eliminate some personal income tax consequences for MEDIN and to "avoid suspicion" from ZABIT. MEDIN directed BACON, and BACON agreed, to draft both Agreements accordingly.

139. During the drafting process in March 2017, however, ZABIT sensed that he was not being fully included in decisions about it.  It seemed surreptitious and one-sided.  This prompted ZABIT to insist that every iteration of the back and forth passing of drafts among parties include him.

140. ZABIT's suspicions turned out to be prophetic as evidenced by the following covert email from MEDIN to BACON on March 9, 2017, at 6:09 a.m., in which MEDIN and BACON conspired to work around ZABIT's request to be copied on every iteration; MEDIN suggests to BACON that perhaps ZABIT should receive a different version of a draft than that BACON planned to send to MEDIN:

> Given Bill's [ZABIT's] request to "be included in each iteration" of the new drafts of the Operating Agreement, I have outlined some of the items that should be addressed in your first draft, <u>if that is going to go to Bill as the same as it is to me</u>.

(emphasis added).

141. An hour later, at 7:17 a.m., MEDIN sent the following email to attorneys at Fox Rothschild in which he confirmed his intent to lie to ZABIT about why ZABIT would have to give up his controlling interest in BTI, explaining that he would falsely tell ZABIT that the condition was one that was demanded by ZARABI when, in fact, it was solely MEDIN's idea, to which ZARABI had agreed to allow MEDIN to attribute falsely to him. MEDIN also refers to sneaking in additional terms that were not in the final executed "Term Sheet" that he and ZABIT had each signed.

> Just to keep you up to date, Tom Bacon, BTI's corporate attorney, said that he would have the initial draft of the new Operating Agreement out today. As Mr. Zabit requested last night that he wanted to see all versions of the drafts, <u>I sent [BACON] some things that he should address in addition to the items outlined in the "Term Sheet"</u> as we may decide on a different structure.
>
> Although my suggestions were not meant to be fully representative of our final comments, it allows him to

break ground on some of the issues I think will be necessary and <u>I can put the motivation for these on the investor</u>."

(emphasis added).

142. Because ZABIT was continuing to try to negotiate the terms of the deal, MEDIN sent an email to ZABIT, with a copy to BACON, stating that as a result of the parties inability to agree on final terms, he had resigned his position as CEO and managing member of BTI and would be unwinding his entire network of "Affiliate Partners" and shutting BTI down. All of that was simply another pressure tactic to get ZABIT to sign the deal as is. Again, MEDIN falsely blamed the "investor" ZARABI as tho one unwilling to make any further changes to the terms. ZABIT acquiesced and MEDIN withdrew his resignation and continued as CEO and managing member of BTI.

143. In an email in plaintiffs' possession, from MEDIN to defendant ZARABI, dated February 24, 2017, MEDIN stated that "Bill [ZABIT] responds best to a 'ticking clock" and that MEDIN was going to set a manufactured and unrealistic deadline to pressure ZABIT into signing the Reorganization and Second Operating Agreements.

144. In the same February 24, 2017, email, MEDIN told ZARABI of his intention to position ZARABI falsely as majority owner in the Reorganization and Second Operating Agreements, with full control of the BTI LLC, which he explained would allow MEDIN to avoid a major personal income tax liability and also trick

ZABIT into thinking it was ZARABI who wanted the control, saying that would eliminate ZABIT's suspicions:

> If the new Operating Agreement reflects that you have full control, the issues around Zabit's suspicions should be resolved and any of [my personal] tax issues will be eliminated.

145. True to his word, on March 3, 2017, with ZARABI's and BACON's knowledge and consent, MEDIN sent ZABIT an email falsely claiming the deal was about to fall apart imminently and stating that ZABIT had no choice but to agree to ZARABI's supposed terms because the (still unnamed) investor's offer was "less than two hours away from being withdrawn." In fact, ZARABI had made no threat to pull out of the deal. MEDIN further and falsely threatened ZABIT that if the unnamed investor's offer were withdrawn, the result would "be a loss of everything," which would include ZABIT'S ownership of BTI, the BTW50 Index and the $255,000 from ZABIT's youngest son's college tuition fund, which ZABIT had loaned to BTI for startup funding.

146. Defendant BACON, the corporate attorney for BTI who was retained by BTI to represent the best interests of both MEDIN and ZABIT, was directed by MEDIN, with ZARABI's consent, to draft the Reorganization and Second Operating Agreements accordingly. BACON did so and all defendants involved knew full well that they contained false recitals and representations and that ZABIT was being kept in the dark about the truth. All of the defendants agreed to falsify the language in the two Agreements to deceive and to defraud ZABIT and BTWW.

147. ZABIT did not know, at the time he was presented with and eventually signed the documents, that ZARABI did not seek to have full control of BTI, that ZARABI was never intended to be a 54% owner, that the $900,000 from ZARABI was not an equity investment but mostly a short-term loan, that the high-pressure deadlines had been falsely manufactured or that the purpose of the Reorganization and Second Operating Agreements was to set in motion a later sham capital call designed to eliminate ZABIT's remaining equity in BTI. Yet, that was the true purpose of the agreements as the defendants well knew and intended but which ZABIT did not know. The defendants' lies and conduct were designed fraudulently to induce ZABIT to put his signature on both Agreements and they succeeded in that effort.

148. Under great duress, ill health, and at risk of what he was being told would be a devastating financial loss for him and his son if he didn't capitulate, ZABIT indicated his agreement to the terms in both fraudulently-induced documents, although he did so without prejudice. Because he signed without prejudice, ZABIT did not actually agree to the terms of the two fraudulently-induced Agreements. The fact that they were fraudulently induced also makes them legal nullities.

149. Defendants fraudulently induced ZABIT to sign the Reorganization and Second Operating Agreements.

150. ZARABI knowingly signed the fraudulent documents falsely describing his loan as that of a "capital contribution"--one conditioned on ZABIT's relinquishing most of

-49-

his ownership interest in BTI to ZARABI. In fact, as both MEDIN and ZARABI had agreed, ZABIT's ownership interest in BTI would not actually be going to ZARABI. Rather, it would superficially be going to ZARABI only in the documents he would eventually sign. ZARABI was, in truth, agreeing only to let MEDIN park ZABIT's ownership interest with ZARABI for a brief period of time, until MEDIN could pay off ZARABI's loan, at which point ZABIT's ownership interest would end up in MEDIN's pocket, as was the longstanding unlawful goal of MEDIN and the other defendants.

151. ZARABI's loan, masquerading as an investment, was designed to create the false appearance that ZABIT had to reduce his ownership interest to satisfy a supposed investor's condition for making a $900,000 critical investment, and to protect ZABIT's personal loan to BTI. As a result, induced by false pretenses, Zabit's ownership interest in BTI was fraudulently reduced from 54% to 14%.

152. In sum, there was never a $900,000 investment, only a loan falsely described as one, which was intended to provide cover for defendant's efforts to strip ZABIT of his ownership interest. There wasn't a real two-hour deadline for ZABIT to sign or to "lose everything." ZARABI was never intended to have majority ownership in or full control of BTI. All of these supposed facts and factors were part of the takeover plot, fraudulently concocted by MEDIN and the other defendants and misrepresented wrongfully and unlawfully to ZABIT to induce him to relinquish his controlling ownership interest in BTI.

153. MEDIN and the other defendants breached the First Operating Agreement by not repaying the outstanding loans from ZABIT with new investor funding and indicating that they would not do so unless ZABIT capitulated to dilute his ownership interests in BTI and to the other onerous terms set forth in the proposed Reorganization and Second Operating Agreements.

154. Had either ZABIT or MEDIN secured a legitimate investor, any funding would not have been conditioned on ZABIT relinquishing his majority ownership interest in BTI, as he would eventually be forced to do under the corrupt and phony "investment" plan concocted by MEDIN, ZARABI and the other defendants.

155. Like the First Operating Agreement, the Reorganization and Second Operating Agreements recited the equity each member had in the company. They recited ZABIT's percentage as 14%, and his "capital account" as $233,333. MEDIN rewarded himself, he explained, for "finding the investor" by claiming an additional 14 percent of the company, so MEDIN's percentage was recited as 32%, with a capital contribution of $533,333. ZARABI's percentage was recited as 54%, and his capital contribution falsely reported as $900,000. ZARABI's capital account figure was a purely fraudulent figure because he was not an investor, only a lender except for a modest $125,000 investment.

156. MEDIN was again designated as "Managing Member" of BTI, with responsibility to manage BTI's business within the same limitations as contained in the First Operating Agreement.

157. As in the First Operating Agreement, the Second Operating Agreement also provided that "no Member shall be required to make any additional Contributions or loans to the Company."  Second Operating Agreement ¶ 6.2 (emphasis added).

158. MEDIN and the other defendants, however, maliciously and deviously slipped in other innocuous-looking capital-call language, the effect of which was to give MEDIN the authority to make capital calls.  While the provision reassuringly stated that "Members may make additional Contributions if and to the extent they so desire," Second Operating Agreement ¶ 6.2, the real purpose was to permit a capital call that would be designed to drop ZABIT's already watered-down percentage ownership of BTI down to zero.

159. Thus, the defendants included a potentially-expansive predicate for MEDIN to make capital calls on as little as 15 days' notice.  Under the agreement, MEDIN had virtually unlimited discretion to call for additional contributions merely if he "determine[d] that such additional Contributions are appropriate for the conduct of the Company's business . . . ."  Second Operating Agreement ¶ 6.2.  The agreement provided more (falsely) reassuring language, providing that "Members shall have the opportunity, but not the obligation, to participate in such additional Contributions on a pro rata

basis in accordance with their respective Participation
Percentages." Id.

160. The Second Operating Agreement further provided
that if a capital call notice were undersubscribed, MEDIN would
have "reasonable discretion" to allow a "third party deemed
acceptable" by MEDIN to make "contributions" to the extent of the
undersubscription. Id.

161. MEDIN and the other defendants included other
critical language in the capital call provision of the Second
Operating Agreement. It reasonably stated that "Contributions
will increase each contributing Member's Capital Account and the
Participation Percentages" id., and that "units of Membership
Interest of the Members will be revalued and restated in
accordance with the [Internal Revenue Service] Code, and any
applicable Regulations," id., adding that any such revaluation
would also be made "in accordance with the Managing Member's good
faith determination of the value of such Contributions relative
to the overall value of the Company," id.

162. The Second Operating Agreement continued: "Each
of the Members expressly acknowledges that his, her or its
Participation Percentage may be diluted due to a failure to make
pro rata Contributions when called for hereunder . . . ." Id.
As ZABIT would learn not too long afterwards, that provision gave
MEDIN free rein to reduce ZABIT's already dwindled participation
percentage to zero. That was the intent of MEDIN and the other

defendants when they agreed to put these capital-call provisions in the Second Operating Agreement.

163. The Second Operating Agreement contained the same prohibition on members whose membership interests had been transferred, from disclosing any "Confidential Information" of the company during a two-year period, which it defined as "all trade secrets, 'know-how,' menu items, customer lists, pricing policies, operational methods, programs, and other business information of the Company created, developed, produced or otherwise arising before the date of the Transfer." Second Operating Agreement ¶ 21.1(c).

164. Like the First, the Second Operating Agreement also provided for reasonable attorneys' fees and costs to be paid to the prevailing party in any litigation.

165. MEDIN and the other defendants had no intention of honoring any of the provisions in the Second Operating Agreement that benefitted ZABIT.

166. ZABIT signed the Reorganization and Second Operating Agreements but specifically stated that he was doing so without prejudice. Therefore, both are legal nullities with respect to ZABIT. Absent the fraudulent inducements and other false representations made to him, ZABIT would never have signed either agreement.

### The Defendants' Wrongful Termination of the BTWW/BTI Licensing Agreement and the Fatal Capital Call

167. Now firmly in charge of BTI, defendants, using BTWW's proprietary BTW50 Index IP methodology (which BTI was

licensed to use only to drive the BVAL ETF and other financial products), created a clone index, the EQM Index.  Then they simply dropped the BTW50 Index as the driver for the BVAL ETF.

168. Defendants then executed the planned, concocted sham capital call, which was designed to reduce ZABIT's ownership interest in BTI from its already-greatly diminished percentage to zero.  Despite terms in both the First and Second Operating Agreements that permitted a dilution proportional to the amount of a new investment (of which there was little here, since ZARABI's sham funding was mostly a loan), MEDIN sent a letter to ZABIT stating that effective May 4, 2018, MEDIN "and a Majority In Interest of" the members of the BRANDOMETRY LLC had decided to make a capital call that didn't conform to those terms.

169. According to the letter, ZABIT had to decide whether to pay $60,480 within two weeks or have his measly remaining ownership interest reduced to 0%.  That result was not only mathematically impossible but utterly irreconcilable with the terms of either operating agreement.  Yet, that is where ZABIT ended up, with nothing.

170. The emails and other documents in plaintiffs' possession also establish that the defendants simultaneously conspired to set the stage for a sham failure of BTI to make minimum payments to defendant TENET, which supplied the critical branding data for use by the BTW50 Index algorithm.  Although a minimum payment provision was arguably reasonable to include in

the Tri-Agreement between BTWW, BTI and TENET, strict enforcement of that provision if and when BTI ever missed a payment was not.

171. MEDIN and BRIDWELL, however, had agreed that when the time came to strike the fatal blow to BTWW and ZABIT, MEDIN would falsely claim that BTI could not make its minimum payment. They further agreed that MEDIN would not try to negotiate some type of agreement to restructure the minimum payment schedule but that BRIDWELL and TENET would, instead, strictly enforce it by having TENET terminate the Tri-Agreement. It was all part of an overall plan under which BTI would eventually falsely claim it could not make the payment, setting the stage for TENET to claim, as part of the plot to steal the intellectual property of BTWW, that it was terminating its agreement with BTWW and BTI to supply its brand data, which it did stop supplying, crippling BTWW's BTW50 Index.

172. Between May 1 and May 9, 2018, the defendants put this final phase of their corrupt plot into operation with a series of five notices:

173. On May 1, 2018, MEDIN sent a letter to ZABIT declaring the dissolution of the Licensing and Royalty Agreement between BTWW and BTI/Brandometry under which BTWW had granted BTI an exclusive, royalty-free use of the BTW50 Index to create investment products. MEDIN's letter terminated that agreement effective June 1, 2018. ZABIT emailed MEDIN and asked him to identify his legal reasons why. MEDIN's email response on May 2,

2018, contained concocted false and meritless claims and allegations of failures by Wilshire, ZABIT and BTWW.

174. MEDIN and the other defendants breached the licensing agreement by terminating it without giving BTWW the thirty days required under it to cure.  Therefore, BTI/BRANDOMETRY not only terminated the licensing agreement without cause, it independently breached it by terminating it without the required thirty-day notice.

175. On May 1, 2018, RAGAUSS, of BRANDOMETRY's affiliate partner, EXPONENTIAL ETFs, wrote Michael Kennedy of Wilshire Associates and stated that the BRANDOMETRY Brand Value ETF was discontinuing the use of the BTW50 Index and will no longer need Wilshire's services as of June 1, 2018.  Upon information and belief, RAGAUSS wrote at the request of MEDIN and the other defendants, with the intent to help carry out the plot to steal the algorithms and other intellectual property of the BTW50 Index.

176. On May 1, 2018, MEDIN sent a notice to BRIDWELL and TENET, copying ZABIT, stating that BRANDOMETRY would not be paying the minimum royalty payment to TENET that was a requirement of the contractual "out" in the Tri-Agreement that MEDIN and BRIDWELL had decided to include as part of their plot to orchestrate the removal of plaintiffs.  The "out" provided TENET a purported basis to terminate that agreement, denying BTWW the vital brand data required to calculate the BTW50 Index.

177. On May 4, 2018, MEDIN changed BTI's name to BRANDOMETRY and later changed its address to MEDIN's apartment at 320 East 57th Street, 15A, New York, New York 10022. MEDIN also created a separate entity (BRANDOMETRY GROUP LLC formed on March 13, 2017) to provide a means to hold funds surreptitiously and separately from BRANDOMETRY.

178. On May 9, 2018, just as they had planned a year earlier, BRIDWELL sent a notice to ZABIT and MEDIN using the default opportunity teed up by MEDIN's claimed default letter of May 1, 2018, to terminate TENET's exclusive agreement to provide BTWW the critical brand data it needed to drive the BTW50 Index. Cutting off its data rendered the BTW50 Index defunct. MEDIN and BRIDWELL, however, both secretly knew that the BVAL ETF, which depended on stock picks generated by the BTW50 Index, would be just fine because they already had a plan to replace the BTW50 Index seamlessly with the copycat EQM Index, which would run on the very data supplied by TENET that TENET was refusing to provide to run the BTW50 Index.

179. Like the sham $900,000 "investment" and the phony two-hour deadline for ZABIT to acquiesce in it, the claimed inability of BTI (by now, renamed BRANDOMETRY) to make the minimum payment was an utter concoction designed and executed solely as the last step in the orchestrated plot to steal the BTW50 Index and the BVAL ETF from plaintiffs.

180. Indeed, a mere three weeks after BTI/BRANDOMETRY's preplanned May 1, 2018, notice to TENET that it could not make

the minimum royalty payment, and after TENET's preplanned termination of its agreement to provide critical brand data to BTWW, TENET was right back in business with BTI/BRANDOMETRY, supplying BTI/BRANDOMETRY with the very brand data for which BTI/BRANDOMETRY had just said it could no longer afford to pay.

181. On June 1, 2018, with no public announcement of the change, the BVAL ETF began tracking the copycat EQM Index instead of the BTW50 Index. All members of the BTW50 Index Committee remained on, and became members of, the EQM Index Committee.

182. The net result of this was that BTI/BRANDOMETRY-- of which ZABIT by now owned only a paltry 13%, after MEDIN reduced his 14% percentage even more, without explanation--had a direct relationship with TENET, cutting BTWW out of the picture. Instead of supplying brand data to BTWW (of which ZABIT remained the majority owner) to generate stock picks for its BTW50 Index, which in turn drove the BVAL ETF, TENET began supplying the very same data to BTI/BRANDOMETRY, to service its copycat EQM Index. It defies sound business reasoning that TENET would be so anxious to make a new deal with BTI/BRANDOMETRY, the very company that had just said it couldn't fulfil the contractual promise in the Tri-Agreement to make its minimum payments.

183. It wasn't enough for the conspirators to drop ZABIT's interest in BTI and the BVAL ETF from 54% to 13%. They wanted him completely out. Thus, on May 8, 2018, one week after the barrage of May 1, 2018, notices, MEDIN sent another letter to

ZABIT declaring a capital call and stating that if ZABIT wanted
to retain his remaining 13% ownership in BTI/BRANDOMETRY, he
would be required to contribute $60,480 in two weeks.  Otherwise,
MEDIN explained, ZABIT's ownership interest would be reduced to
0%.  There was no legitimate reason for this capital call.  Its
only purpose was to provide cover to steal ZABIT's remaining
interest in BTI/BRANDOMETRY.

184. Despite terms in the operating agreement that
permitted a dilution proportional to the amount of a new
investment (of which there was, again, none here, since all but
$125,000 of ZARABI's funding was nothing more than a loan),
defendants used this sham capital call to reduce ZABIT's
ownership share to zero.  That is where ZABIT ended up, because
he would not capitulate to this attempt to extort an additional
$60,480 from him.

185. This was the final fulfillment of defendants'
master plan.  They completely stole the intellectual property of
BTWW, which was ZABIT's company, by copying and using the
algorithms that underlay the BTW50 Index and completely stole all
ZABIT's ownership interests in BTI/BRANDOMETRY, the company that
owned and operated the BVAL ETF.

186. Just ten days before BRANDOMETRY's May 1, 2018,
notices stating that the BVAL ETF will no longer be using the
BTW50 Index as of June 1, 2018, it launched a "high-profile email
solicitation campaign" fraudulently representing that the BTW50
Index, calculated by Wilshire, was at the core of BRANDOMETRY's

BVAL ETF on the New York Stock Exchange--falsely inferring that
would continue to be the case.  The campaign positioned the BTW50
Index as the prime reason why Registered Investment Advisors
("RIA's") and individuals should invest in the BVAL ETF.  Both of
those representations were entirely misleading because, as noted,
BRANDOMETRY planned to drop, and did drop, both the BTW50 Index
and Wilshire only ten days later.

187. BTI/BRANDOMETRY and TENET are now operating under
an exclusive bilateral agreement, which grants BTI/BRANDOMETRY
the same exclusive rights to use TENET's brand data for the
copycat EQM Index that, up until the defendants' corrupt ending
of TENET's relationship with BTWW, had been BTWW's exclusive
right to use to drive the BTW50 Index.

188. The defendants' premeditated plan to cancel the
licensing agreement and also to tee up the cancellation of the
Tri-Agreement required advance coordination and planning between
all the defendants.  They had to find an index provider, create a
new index, carry out the necessary fillings for it and perform
all testing and work with their affiliates to get ready to
proceed with their plan on June 1, 2018.  The entire Index
Committee plus all of the other defendants had to be involved for
this to happen.

189. All BTI/BRANDOMETRY affiliates had to be aligned
and ready to go on June 1, 2018, to implement the new operational
scheme.  To make that happen, all the defendants had to be aware
far in advance of their individual roles, timelines and

responsibilities required to eliminate all existing agreements between and among BTWW, BTI/BRANDOMETRY, TENET and Wilshire. It took additional planning and time to create, to negotiate and to execute replacement agreements with the new team to have everything in place by June 1, 2018.

190. And, indeed it did take a "team effort" to pull off the plot, as BRIDWELL indicated in a self-congratulatory public posting on LinkedIn after the 2017 ringing of the closing bell at the New York Stock Exchange announcing the launch of the BVAL ETF. The plot to steal BTWW's intellectual property and ZABIT's interest in the BTI required the carefully-planned coordination of each of the named defendants. They each knowingly and willingly contributed the efforts they had been asked to provide under the plot.

191. In the term sheet signed on March 3, 2017, MEDIN agreed that ZABIT would be invited to and would have a "prominent place" in the New York Stock Exchange bell-ringing event to celebrate the launch of the BVAL ETF. This was an event of immense importance to ZABIT personally, as it represented the culmination of his years of work creating the BTW50 Index and the BVAL ETF. The term sheet said the invitation/participation would be incorporated in the Second Operating Agreement along with the other agreed-upon terms but it wasn't because MEDIN, in secret email correspondence to VENUTO and BACON shortly after ZABIT signed the term sheet, indicated that he had no intention to

honor this commitment.  MEDIN said he was not going to invite
ZABIT--and he did not.

192. In any event, in his public LinkedIn posting,
BRIDWELL named the majority of the defendants in this complaint,
along with his own company, in a celebration of the false claim
that the BVAL ETF was their own creation.  As BRIDWELL stated
there under a smiling team photo:

> Congratulations to the Brandometry team on the
> wonderful event at the NYSE yesterday.  Sharing the
> Closing Bell with Larry Medin, Susan Avarde and Tony
> Wenzel is a highlight.  This event underscores the
> incredible collaboration between Tenet Partners,
> Exponential ETFs, EQM Indexes LLC, Toroso Investments
> and Thompson Reuters.  Building an investment product
> innovation using brand and financial data is most
> certainly a team sport!

193. The copycat EQM Index that currently underlies the
BVAL ETF is identical in every respect, save for one cosmetic
detail, to the BTW50 Index.  It is, in fact, the BTW50 Index
simply repackaged under a different name.  The intellectual
property of the BTW50 Index, whether slightly altered or not
remains with and is the property of BTWW.  The defendants' use of
it to drive their copycat EQM Index constitutes a theft and/or
misappropriation of plaintiffs' trade secrets.

194. The defendants already had in place an entire
replacement plan and took all necessary steps to implement it
while the licensing agreement and the Tri-Agreement with BTWW
were still in full force and effect.  Accordingly, their actions
constitute breaches of contract, as well as tortious interference
with a business relationship between BTI/BRANDOMETRY and BTWW.

195. With the reawakened business relationship between BTI/BRANDOMETRY and TENET, the plot to steal the BTW50 Index algorithms and the BVAL ETF was complete. BTI/BRANDOMETRY has remained in the business of marketing the BVAL ETF, now powered by a copycat brand-based index, using the same branding data supplied by TENET as TENET had provided for the BTW50 Index, analyzed with identical algorithms as those used by the BTW50 Index, and with all of that being done through an entity that no longer involves ZABIT.

196. MEDIN falsely claims to have "developed the EQM Brand Value Index with EQM Indexes." MEDIN, AVARDE and WENZEL also falsely claim to be the co-founders of BRANDOMETRY/BTI, a false statement because MEDIN and ZABIT were BRANDOMETRY/BTI's co-founders. MEDIN and the others are nothing more than thieves.

197. The algorithms, proprietary formulas, patterns, methodology, technical information, processes, programs, codes and compilation of information used to develop, and which continue to underlie, both the BTW50 Index and the BVAL ETF were and are trade secrets, which were not known to any competitors of plaintiffs or others operating in plaintiffs' businesses.

198. The fact that they were and still are not known by such competitors gave plaintiffs and advantage over competitors who did not, and still do not, know them or use them.

199. Defendants' use of such trade secrets gives them an opportunity to obtain an advantage over plaintiffs, who no longer have access to them or the data needed to utilize them.

200. When plaintiffs had the exclusive use of the trade secrets, they derived independent economic value from their not being generally known or readily ascertainable by another person who could obtain economic value from their disclosure, including defendants operating independently of plaintiffs.  They did that for several reasons.

201. First, they had the exclusive ability to license third parties to use the trade secrets in return for a licensing fee.  If the trade secrets were known in their industry, they would not be able to leverage the secret nature of them to generate income.

202. Second, they had the exclusive ability to market their own ETF, the BVAL ETF, and to have consumers invest, and to persuade RIA's to invest their own clients', funds in the BVAL ETF.  With a competitor now having knowledge and use of the trade secrets to create and to market a copycat index and to use that to drive the BVAL ETF defendants' wrongly misappropriated from plaintiffs and defrauded them into giving up, plaintiffs can no longer derive any income or other type of economic value from them.

203. Defendants used plaintiffs' trade secrets in breach of their agreements and in violation of their confidential relationships and/or duties with or to plaintiffs and/or as a result of discovery by improper means.

204. Plaintiffs have no adequate remedy at law because, among other reasons, some of their claims for relief seek

equitable remedies such as enjoining defendants from using the stolen and/or embezzled trade secrets for their own advantage, creating competition with plaintiffs that would be eliminated if the are ordered not to continue using the unlawfully-obtained information and products.

CLAIMS FOR RELIEF

COUNT I

Defend Trade Secrets Act
(18 U.S.C. § 1836(b))

205. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

206. Plaintiffs owned and continue to own trade secrets.

207. Defendants misappropriated those trade secrets.

208. With intent to convert a trade secret for their own economic benefit and to the economic detriment of plaintiffs, and intending and/or knowing doing so would injure plaintiffs, defendants stole and/or without authorization appropriated, took, carried away and/or concealed, or by fraud, artifice, or deception obtained such information.

209. Without authorization, defendants copied, duplicated, sketched, drew, photographed, downloaded, uploaded, altered, destroyed, photocopied, replicated, transmitted, delivered, sent, mailed, emailed, communicated and/or conveyed such information.

210. Defendants received and/or possessed such information, knowing the same to have been stolen, appropriated, misappropriated, obtained or converted without plaintiffs' authorization.

211. Defendants attempted to engage in the above unlawful conduct.

212. The trade secrets involved implicated and continue to implicate interstate commerce.

213. Plaintiffs were injured as a result of such conduct by defendants and sustained damages in an amount to be proven at trial.

<u>COUNT II</u>

<u>Misappropriation of Trade Secrets</u>

214. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

215. Plaintiffs possessed and still possess trade secrets.

216. They are or were used in plaintiffs' business, and give or gave plaintiffs an opportunity to obtain an advantage over competitors who do not have them or do not know how to use them.

217. Defendants are using those trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.

218. Defendants' misappropriations caused plaintiffs damages, and threaten to cause plaintiffs to sustain additional damages, in an amount to be proven at trial.

<u>COUNT III</u>

<u>Theft/Embezlement</u>

219. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

220. At all relevant times, plaintiffs retained all right, title, and interest in their trade secrets.

221. Defendants were entrusted with the trade secrets and agreed to use them only for the benefit of plaintiffs.

222. Defendants also gained access to, and stole, trade secrets without plaintiffs' authorization.

223. Defendants knowingly, dishonestly, and intentionally took and retained plaintiffs' trade secrets and other information without authorization.

224. Defendants' acts constitute a knowing, unlawful and intentional theft and/or embezzlement of trade secrets and information for defendants' economic benefit and knowingly, unlawfully and intentionally caused economic detriment of plaintiffs.

225. As a direct and proximate result of such conduct by defendants, plaintiffs suffered substantial damages in an amount to be proven at trial.

226. Defendants' actions were willful, malicious and outrageous and were undertaken with reckless indifference to and disregard of the rights of plaintiffs.

<u>COUNT IV</u>

<u>Breach of Confidence</u>

227. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

228. Defendants wrongfully usurped the confidential details learned while working with plaintiffs to develop the BTW50 Index and BVAL ETF.

229. Defendants did so for personal gain.

230. Defendants acted either singly and/or in concert with each other to breach their duties of confidence owed to the plaintiffs by engaging in the unlawful acts described above.

231. Defendants committed overt acts including, but not limited to, the unauthorized taking of trade secrets and confidential information, and competing, in an unfair manner, against the plaintiffs.

232. As a direct and proximate result of the acts done as a result of this breach of confidence, plaintiffs have been damaged and will continue to suffer economic and reputational injury.

233. As a direct and proximate result of the defendants' breach of confidence, plaintiffs have suffered substantial damages in an amount to be proven at trial.

## COUNT V

## Fraud

234. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

235. Defendants made misrepresentations or a material omission of fact to plaintiffs.

236. Those misrepresentations or material omissions of fact were false.

237. Defendants knew those misrepresentations or material omissions of fact were false.

238. Defendants made those misrepresentations or material omissions of fact for the purpose of inducing ZABIT and the other plaintiffs to take certain steps or to enter into certain agreements that they would not have taken or entered into had defendants been truthful to ZABIT and plaintiffs.

239. Plaintiffs justifiably relied on defendants' misrepresentation or material omission of fact.

240. Plaintiffs were injured as a result of such reasonable reliance and sustained damages in an amount to be proven at trial.

241. Plaintiffs' injuries were proximately caused by and/or were the natural and probable consequence of defendants' misrepresentation or material omission of fact and/or defendants ought reasonably to have foreseen that plaintiffs injuries were a probable consequence of their fraud.

Aiding and Abetting Fraud

242. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

243. Defendants made misrepresentations or material omissions of fact to plaintiffs.

244. Defendants' misrepresentation or material omission of fact were false.

245. The other defendants knew or should have known those misrepresentations or material omissions of fact were false.

246. Defendants made those misrepresentations or material omissions of fact for the purpose of inducing ZABIT and the other plaintiffs to take certain steps or to refrain from taking certain steps, including but not limited to entering into the Second Operating Agreement.

247. No defendant justifiably relied on another defendant's misrepresentations or material omissions of fact.

248. Defendants had knowledge of the fraud and provided substantial assistance in carrying out the fraudulent scheme.

249. Plaintiffs were injured as a result of their reliance and sustained damages in an amount to be proven at trial.

250. Plaintiffs' injuries were proximately caused by and/or were the natural and probable consequence of defendants' misrepresentations or material omissions of fact.

<u>COUNT VII</u>

<u>Fraudulent Inducement</u>

251. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

252. Defendants made false representations of material fact.

253. Defendants knew that each of their representations were untrue.

254. Defendants made their false representations with the intent of inducing plaintiffs' agreement to enter into the agreements described above.

255. Plaintiffs justifiably relied upon defendants' false representations.

256. As a result of that reasonable or justifiable reliance, plaintiffs sustained damages in an amount to be proven at trial.

<u>COUNT VIII</u>

<u>Fraudulent Concealment</u>

257. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

258. Defendants made misrepresentations or omissions of material fact which were false and which defendants knew were false.

259. Defendants' misrepresentations or material omissions were made for the purpose of inducing plaintiffs to rely upon them.

260. Plaintiffs reasonably or justifiably relied on defendants' misrepresentations or material omissions.

261. Defendants had a duty to disclose material information and failed to do so.

262. Plaintiffs were injured as a result and sustained damages in an amount to be proven at trial.

<u>COUNT IX</u>

<u>Fraudulent Misrepresentation</u>

263. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

264. Defendants made misrepresentations or omissions of material fact which were false and which defendants knew to be false.

265. Defendants misrepresentations were made for the purpose of inducing plaintiffs to rely upon them.

266. Plaintiffs reasonably or justifiably relied on defendants' misrepresentations or material omissions.

267. Plaintiffs were injured as a result and sustained damages in an amount to be proven at trial.

<u>COUNT X</u>

<u>Breach of Fiduciary Duty</u>

268. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

269. Defendants had a special or privity-like or other relationship of trust with plaintiffs.

270. It imposed a duty on defendants to act with care with respect to plaintiffs.

271. It created a fiduciary duty for defendants with respect to plaintiffs.

272. Defendants failed to fulfil that duty.

273. That failure caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XI</u>

<u>Aiding and Abetting Breach of Fiduciary Duty</u>

274. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

275. MEDIN had a fiduciary duty to plaintiffs to protect their interests in the algorithms underlying the BTW50 Index and BTI.

276. The other defendants knew or should have known that MEDIN had that fiduciary duty to plaintiffs.

277. The other defendants knew or should have known that MEDIN was violating that fiduciary duty but nevertheless knowingly and willingly assisted in MEDIN's violations of it.

278. The other defendants had knowledge of MEDIN's duty and either substantially assisted or procured the violation of it.

279. The other defendants' actions caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XII</u>

<u>Tortious Interference</u>

280. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

281. Plaintiffs, BTWW, BTI, TENET and Wilshire Associates had valid and enforceable contractual agreements between them.

282. Defendants had knowledge of those agreements.

283. Defendants intentionally interfered with those agreements.

284. Without justification, defendants intentionally procured breaches of those agreements by those parties who had valid agreements with plaintiffs.

285. Those agreements were, in fact, breached.

286. Defendants' interference caused the breaches of those agreements.

287. The conduct of the corporate-officer defendants were outside the scope of their employment.

288. Each corporate officer-defendant personally profited from his or her acts in contravention of their respective corporation's interests.

289. The defendants' acts were performed with malice and were calculated to impair the plaintiffs' businesses for the personal profit of each defendant.

290. Plaintiffs were injured as a result and sustained damages in an amount to be proven at trial.

<u>COUNT XIII</u>

<u>Unjust Enrichment</u>

291. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

292. The algorithms underlying the BTW50 Index, ZABIT's interest in BTI and TENET's exclusive license to provide brand data are all valuable.

293. Defendants have benefitted or stand to benefit from wrongfully stealing and usurping them.

294. Defendants have been enriched at plaintiffs' expense.

295. Equity and good conscience militate against permitting defendants to retain what plaintiffs are seeking to recover.

296. Defendants have been, or will in the future be, unjustly enriched at the expense of plaintiffs, and are liable to plaintiffs in an amount to be established at trial.

<u>COUNT XIV</u>

<u>Unfair Competition</u>

293. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

297. Defendants misappropriated plaintiffs' labors, skills, expenditures and/or good will.

298. Defendants did so in bad faith.

299. Defendants' actions caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XV</u>

<u>Unfair Trade Practices</u>

293. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

300. Defendants agreed, combined and acted with a common plan and purpose to defraud, misappropriate and to utilize Plaintiffs' trade secrets, by engaging in the conduct described above.

301. Defendants committed overt acts including, but not limited to, the unauthorized taking of trade secrets and confidential information, and competing, in an unfair manner, against the plaintiffs.

302. As a direct and proximate result of these unfair trade practices, plaintiffs have been damaged and will continue to suffer economic and reputational injury and injuries to their ability to compete in the marketplace.

303. As a direct and proximate result of these unfair trade practices, plaintiffs have suffered substantial damages.

304. Defendants actions have been willful and outrageous and undertaken with reckless indifference to the rights of plaintiffs.

<u>COUNT XVI</u>

<u>Breach of Contract</u>

305. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

306. Plaintiffs and defendants were parties to express and implied-in-fact contracts, including but not limited to the Tri-Agreement, non-disclosure agreements and the first and second operating agreements.

307. Plaintiffs provided consideration when they entered into these contracts.

308. Plaintiffs performed their duties under the contracts.

309. Defendants failed to perform their duties under the contracts.

310. Defendants' breaches caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XVII</u>

<u>Breach of Attorney-Client and/or Special Relationhip</u>
(Defendants BACON and BACON LAW GROUP only)

311. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

312. Defendants BACON and BACON LAW GROUP had an attorney-client relationship with plaintiffs.

313. Defendants BACON and BACON LAW GROUP had a special relationship with plaintiffs that approached that of an attorney-client relationship based on privity.

314. Defendants BACON and BACON LAW GROUP had a duty of loyalty and fair dealing to plaintiffs.

315. Defendants BACON and BACON LAW GROUP violated those duties.

316. Defendants BACON and BACON LAW GROUP breached their attorney-client and/or their special relationship with plaintiffs.

317. Those violations and breaches caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XVIII</u>

Aiding and Abetting Breach of
<u>Attorney-Client and/or Special Relationhip</u>
(All defendants other than BACON and BACON LAW GROUP)

318. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

319. The defendants knew or should have known that BACON and BACON LAW GROUP had an attorney-client and/or special relationship with, and duty of loyalty to, plaintiffs.

320. The defendants knew or should have known that BACON and BACON LAW GROUP were violating their duties to plaintiffs but nevertheless knowingly and willingly assisted in their violations of it.

321. The defendants had knowledge of the attorney-client and/or special relationship between BACON, BACON LAW GROUP and plaintiffs and of their resulting duties to plaintiffs and either substantially assisted or procured the violation of them.

322. The defendants' actions caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XIX</u>

<u>Civil Conspiracy</u>

323. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

324. Defendants agreed and conspired to defraud plaintiffs and to commit each of the wrongs alleged as separate causes of action in this complaint.

325. Defendants acted on their unlawful agreement.

326. Each defendant made an overt act in furtherance of the conspiracy.

327. Defendants agreed to commit all of the substantive unlawful actions alleged in the various substantive causes of

action alleged in this complaint with the goal of achieving those unlawful objectives.

328. Defendants' agreement and actions taken pursuant to them caused plaintiffs damages in an amount to be proven at trial.

<u>COUNT XX</u>

<u>Declaratory Judgment and Equitable Relief</u>

329. Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs with the same force and effect as if fully set forth herein.

330. The Court should enter a judgment declaring that ZABIT and BTWW are the sole and exclusive owners and licensees of the BTW50 Index and its underlying algorithms.

331. The Court should permanently enjoin defendants from using the BTW50 Index, its underlying algorithms and the EQM Index and from representing that any of these items are owned by them.

332. The Court should direct TENET specifically to perform its obligations under the Tri-Agreement by providing the branding data to BTWW. It should also enjoin TENET from providing to any other person or entity the data it is currently providing to BRANDOMETRY.

## DAMAGES

WHEREFORE, plaintiffs demands judgment against the defendants as follows:

A.    Compensatory damages in the amount of $50,000,000;

B.    Disgorgement of any revenues, income or profits earned by defendants through the wrongful conduct set forth above including, but not limited to, their theft or misappropriation or embezzlement of trade secrets;

C.    Treble damages in the amount of $150,000,000;

D.    Punitive damages of $50,000,000;

E.    Interest on all monetary damages;

F.    A declaration that plaintiffs are the sole and exclusive owners and licensees of the BTW50 Index and its underlying algorithms;

G.    An order permanently enjoining defendants from using the BTW50 Index, its underlying algorithms and the EQM Index and from representing that any of these items are owned by them;

H.    An order directing TENET specifically to perform its obligations under the Tri-Agreement by providing the branding data to BTWW, and permanently enjoining TENET from providing to any other person or entity the data it is currently providing to BRANDOMETRY;

I.    Attorney's fees; and

J.    Such other and further relief as the Court deems just and proper.

Dated:   South Salem, New York
         June 1, 2020

_____
ALEXANDER E. EISEMANN AE5405
Counsel for Plaintiffs
   William Zabit and
   Brand Transact Worldwide, Inc.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 420-8300
aee@eislaw.com