UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X
                                            :

WILLIAM ZABIT and BRANDTRANSACT        :
WORLDWIDE, INC.,                              :
                                            :              20 Civ. 555 (JPC)
                   Plaintiffs,           :
                                            :           OPINION AND ORDER
           -v-                              :
                                            :
BRANDOMETRY, LLC et al.,                :
                                            :
                   Defendants.         :
                                            :
------------------------------------------------------------------------ X

JOHN P. CRONAN, United States District Judge:

        Plaintiffs William Zabit and BrandTransact Worldwide, Inc. ("BTWW") accuse

Defendants[1] of conspiring to steal their "groundbreaking stock-index concept" and "strip [Zabit's]

ownership in the company that was created to market financial products around th[at] index."  Dkt.

63 ("Second Amended Compl.") ¶ 1.  Plaintiffs bring a claim under the Defend Trade Secrets Act

("DTSA"), 18 U.S.C. § 1836(b), as well as several state law claims.  Now before the Court are

---

[1] The Defendants listed on the docket are Brandometry, LLC, f/k/a BrandTransact
Investments, LLC ("BTI"); Brandometry Group, LLC ("Brandometry Group"); Larry A. Medin;
LAM Associates, Inc.; Frank Zarabi, a/k/a Farhad M. Zarabi, a/k/a Farhad Zarabi; Susan Avarde;
Tony Wenzel; Brandlogic Corp. d/b/a Tenet Partners; Corebrand Analytics, LLC, d/b/a Tenet
Partners; Corebrand Data Science; Tenet Partners ("Tenet"); Hampton Bridwell; James Gregory;
Toroso Investments, LLC, d/b/a Tidal Growth Consultants ("Toroso"); Michael Venuto; ASCI
Funds; Exponential ETFs; Phil Bak; Charles A. Ragauss; EQM Indexes, LLC; Jane Edmondson;
Bacon Law Group; and Thomas C. Bacon.

        On August 15, 2020, Plaintiffs filed a stipulation of dismissal without prejudice signed by
Avarde, Wenzel, Toroso, Venuto, Edmonson, Bak, ACSI Funds, and Exponential ETFs,
purporting to dismiss those Defendants.  Dkt. 108.  However, Rule 41 of the Federal Rules of Civil
Procedure only allows for dismissal by stipulation if the stipulation is "signed by all parties who
have appeared."  Fed. R. Civ. P. 41(a)(1)(A)(ii).  The Court instead dismisses Plaintiffs' claims as
to those Defendants without prejudice pursuant to its authority under Rule 41(a)(2).

motions to dismiss from all Defendants remaining in this case: (1) Brandometry, Brandometry Group, Medin, and LAM Associates, Inc., referred to herein as the "Brandometry Defendants," Dkts. 114, 115 ("Brandometry Defendants Motion"); (2) Brandlogic Corp., Corebrand Data Science, Tenet Partners,[2] and Bridwell, referred to herein as the "Tenet Defendants," Dkt. 101, Exh. 1 ("Tenet Defendants Motion");[3] (3) Gregory, Dkt. 102, Exh. 1 ("Gregory Motion"); (4) Zarabi, Dkts. 116, 117 ("Zarabi Motion"); and (5) Bacon and the Bacon Law Group, referred to herein as the "Bacon Defendants," Dkts. 89, 92.

For the reasons stated below, the Court dismisses with prejudice Plaintiffs' DTSA claim, and declines to exercise supplemental jurisdiction over the remaining state law claims, which are dismissed without prejudice.

## I. Background

### A. Facts

The following facts are taken from Plaintiffs' Second Amended Complaint and are presumed to be true for the purpose of the motions to dismiss. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n.1 (2002).

This case concerns an index, the BrandTransact 50 Index Powered by Wilshire ("BTW50

---

[2] The Second Amended Complaint states: "According to T[enet's] website, B[randlogic] and C[orebrand] A[nalytics] 'joined forces' in 2014, and relaunched that combined entity as T[enet] P[artners]. Upon further information and belief, defendants B[randlogic], C[orebrand] A[nalytics], both already doing business under the name 'Tenet Partners,' C[orebrand] D[ata] and T[enet] P[artners] are all alter egos of each other. In each instance in which 'T[enet] P[artners]' or 'T[enet]' is used in this complaint, it should be deemed to include B[randlogic], C[orebrand] A[analytics] and C[orebrand] D[ata] as well." Second Amended Compl. ¶ 32.

[3] The Second Amended Complaint also names Corebrand Analytics, LLC as a party. But the Tenet Defendants state that they are "unaware of any entity by that name and submit that 'Corebrand Analytics LLC' is a non-entity." Tenet Defendants Motion at 1 n.1. Because Plaintiffs do not address this in their Opposition and have made no other showing that Corebrand Analytics LLC is a separate entity, the Court dismisses Corebrand Analytics, LLC without prejudice.

Index"), that Plaintiffs developed over the course of five years. Second Amended Compl. ¶¶ 2, 22. Zabit conceived of the idea of creating an index using brand data and stock prices to pick undervalued stocks. *Id.* ¶ 2. Once developed, the "proprietary algorithm" underlying the BTW50 Index calculated the "spread between a company's brand value and its stock price to identify stocks with unrealized value." *Id.* ¶¶ 63-64. The BTW50 Index picked fifty stocks with the greatest unrealized value for its portfolio, and rebalanced the portfolio annually with new data. *Id.* ¶ 65.

To develop his index concept into a reality, Zabit created BTWW, a Delaware corporation, in 2013. *Id.* ¶¶ 2, 21-22, 53. Zabit, who served as Chief Executive Officer ("CEO") of BTWW, collaborated with several individuals along the way. In 2014, he hired non-party William Bidlack as President and Chief Brand Strategist of BTWW, non-party Monny Sklov as its head of Analytics, and non-party Edgar Baum as a BTWW affiliate partner. *Id.* ¶¶ 56-57. In March 2015, Zabit and Bidlack traveled to New York City to meet with Defendant Larry Medin to discuss the index concept. *Id.* ¶ 60. Medin—the co-founder, part-owner, and, at the time, CEO of Toroso, an investment management company, and the founder and President of LAM Associates, Inc., a consulting company—expressed a desire to create Exchange Traded Fund ("ETF") products based on the index. *Id.* ¶¶ 35, 61. Medin then recommended that they meet with his colleague at Toroso, Defendant Michael Venuto. *Id.* ¶ 61. The following month, Zabit and Bidlack presented the index concept to Venuto, who also expressed interest in creating ETFs based on the index. *Id.* Medin, through his consulting company LAM Associates, Inc., signed a mutual non-disclosure agreement ("NDA") with Zabit. *Id.* ¶ 62. Venuto and Zabit also signed an NDA. *Id.*[4]

---

[4] It is not clear from the Second Amended Complaint at what point Medin and Venuto signed these NDAs. The Second Amended Complaint states that there were "[o]ther meetings with T[oroso]" after the initial two discussed above, "as M[edin] and V[enuto] were hired as consultants," and that "[p]rior to each meeting, M[edin] and Z[abit] signed [NDAs]." Second Amended Compl. ¶ 62. It then goes on to say, however, that Venuto was hired as a consultant by BTI and BTWW and Medin was hired as a consultant by BTI. *Id.* As the Court explains in the

At some point, a so-called Index Committee, described as "an informed and decision-making group on all matters pertaining to the BTW50 Index," was formed. *Id.* ¶ 107. According to the Second Amended Complaint, the members of the Index Committee included Medin, Venuto, Defendant James Gregory, and now-dismissed Defendants Jane Edmonson and Phil Bak. *Id.* Aside from Medin and Venuto, Plaintiffs do not allege that these individuals were subject to confidentiality agreements. They do, however, allege that these individuals were "knowledgeable of every aspect of the underlying algorithm for the BTW50 Index." *Id.* ¶ 110; *see id.* ¶¶ 112, 116, 119.

In July 2015, Zabit and Medin formed a new entity, BTI, "to develop and to market financial products based on the BTW50 Index and other complementary indexes to be developed in the future." *Id.* ¶ 3; *see id.* ¶¶ 4, 68. According to the Second Amended Complaint, Medin served both as an "advisory consultant" and the CEO of BTI. *Id.* ¶¶ 5, 62. On December 1, 2016, Medin and Zabit signed a Limited Liability Company ("LLC") Operating Agreement (the "First Operating Agreement"), which gave Zabit a 54% ownership interest in BTI and Medin a 46% ownership interest in BTI. *Id.* ¶ 70. On the same day, BTWW gave BTI an exclusive, perpetual, royalty-free license to use the BTW50 Index to develop financial products, "a natural result of the fact that Z[abit] owned the majority of both BTWW and BTI." *Id.* ¶ 83. Plaintiffs do not allege that the license included a confidentiality agreement or any other restrictions limiting disclosure

---

subsequent paragraphs, BTI was not formed until July 2015, several months after these alleged meetings with Toroso took place. *See id.* ¶¶ 53, 68. In addition, Plaintiffs submitted several NDAs involving these individuals to the Court in connection with their opposition to the motions to dismiss: (1) a mutual NDA between BTWW and LAM Associates, dated August 28, 2015, Dkt. 140, Exh. 1 at 1-5; (2) a mutual NDA between BTWW and Toroso, which appears to be dated September 12, 2015, *id.* at 6-10; and (3) a mutual NDA between Toroso and BTWW, dated March 24, 2015, *id.* at 11-15. The Court assumes for the purposes of this motion that Venuto and Medin signed NDAs before Zabit shared any confidential information with them.

of information relating to the BTW50 Index or the underlying algorithm.

BTWW continued to develop and modify the algorithm. Although Zabit initially used publicly-available data to source the BTW50 Index, he later approached Tenet to use their brand data instead. *Id.* ¶¶ 85-86. Tenet is "a widely-recognized authority on brand measurement and valuation, which uses a highly stable, quantitative benchmark tracking system with a proprietary model correlating corporate brand to market capitalization." *Id.* ¶ 86. The BTWW team met with Tenet's CEO, Defendant Hampton Bridwell, to discuss the index concept. *Id.* ¶ 87. Bridwell executed a full mutual NDA on behalf of Tenet a few days later. *Id.* BTI, BTWW, and Tenet then entered into a licensing and royalty agreement, the "Tri-Agreement," pursuant to which Tenet would license its brand data to BTWW and would not provide its data to any of the BTW50 Index's competitors. *Id.* ¶ 89. Shortly after the Tri-Agreement was signed, the Director of Wilshire Analytics signed a services agreement between Wilshire and BTWW, pursuant to which Wilshire was to publish the BTW50 Index and rebalance it on annual basis. *Id.* ¶ 95. Then, on July 15, 2016, BTWW "launched the BTW50 Index on Wall Street," and on June 13, 2017, BTI launched the Brand Value Exchange Traded Fund (the "BVAL ETF") on the New York Stock Exchange. *Id.* ¶ 4. The BVAL ETF tracked the BTW50 Index. *Id.*

Plaintiffs contend that while this all was happening, Medin was conspiring with the other Defendants to steal BTI and the BTW50 Index from Plaintiffs. First, Medin, working with Bridwell, "malevolently inserted" a clause into the Tri-Agreement that allowed Tenet to terminate the agreement if BTI "d[id] not pay minimum yearly royalties of $100,000 or 20% of BTI gross revenues, whichever is greater." *Id.* ¶¶ 90-91. Plaintiffs assert that, "[u]pon information and belief," Medin and Bridwell planned to use that condition as pretext to cancel the agreement and deprive the BTW50 Index of the data it needed to function. *Id.* ¶¶ 92-93.

Second, Medin recruited Defendant Frank Zarabi to pose as an "investor" in BTI. Zarabi, at Medin's behest, promised a $900,000 investment in exchange for majority ownership of the company. *Id.* ¶¶ 6, 126, 128, 130-131. Medin then pressured Zabit to accept the deal, falsely claiming that Zarabi would pull the offer if Zabit did not commit. *Id.* ¶¶ 8-9, 142-145. Plaintiffs contend that in reality, the funds were simply a loan from Medin designed to wrestle Zabit's stake away from him. *Id.* ¶¶ 6, 131.

Zabit accepted the offer, and Zabit, Medin, and Zarabi entered into two agreements, the Reorganization Agreement and Second Operating Agreement, to restructure BTI in light of Zarabi's so-called investment. *Id.* ¶ 136. Plaintiffs contend that BTI's lawyer, Defendant Thomas C. Bacon, on behalf of his law firm Defendant Bacon Law Group, falsely listed Zarabi as an investor, knowing that the money in fact came from Medin. *Id.* ¶¶ 7, 137-138. Pursuant to these agreements, Zabit's ownership interest fell from 54% to 13%. *Id.* ¶ 183.

But that was not the only issue with the Second Operating Agreement, according to Plaintiffs: "[T]he other [D]efendants . . . maliciously and deviously slipped in other innocuous-looking capital-call language," the "real purpose" of which was "to permit a capital call that would be designed to drop Z[abit's] already watered-down percentage ownership of BTI to zero." *Id.* ¶¶ 158-162; *see id.* ¶ 162 (quoting the Second Operating Agreement as reading: "Each of the Members expressly acknowledges that his, her or its Participation Percentage may be diluted due to a failure to make pro rata Contributions when called for hereunder . . . ."). In other words, Plaintiffs assert that Medin and "other[s]" inserted contractual language that would allow them to mandate that Zabit make certain investments or risk substantially losing his ownership percentage.

With these seeds planted, Defendants then made their move to push Zabit out of BTI. First, Defendants, using the capital-call language, "concocted [a] sham capital call" and demanded Zabit

pay $60,480 within two weeks or lose any ownership in BTI. *Id.* ¶¶ 168-169, 183.[5]  Second, Medin cancelled the licensing agreement between BTWW and BTI. *Id.* ¶ 173.  Third, Medin and Bridwell "used the trumped-up excuse that BTI couldn't make its minimum royalty payments to T[enet]" to terminate the Tri-Agreement.  *Id.* ¶ 16; *see id.* ¶¶ 170-174, 179.  Plaintiffs do not deny that they could not make these payments, but call this "a pre-planned and contrived out that allowed T[enet] to terminate the agreement to provide brand data to BTWW and BTI."  *Id.* ¶ 16; *see also* ¶ 171.  Plaintiffs contend that while "a minimum payment provision was arguably reasonable to include in the Tri-Agreement . . . , strict enforcement of that provision if and when BTI ever missed a payment was not."  *Id.* ¶ 170.  Then, once Defendants were in control of BTI, they removed the BTW50 Index as the index tracked by the BVAL ETF and replaced it with a new one, the EQM Brand Value Index ("EQM Index"), created with "the intellectual property stolen from BTWW— the algorithms and formulas that underlay the BTW50 Index."  *Id.* ¶¶ 12-14.  Plaintiffs contend that Defendants have since falsely presented the EQM Index as their own invention. *Id.* ¶¶ 181, 185.

Plaintiffs assert that all Defendants had knowledge of this plan and surmise that they must have worked together to accomplish it.  *See id.* ¶¶ 188 ("The defendants' premeditated plan to cancel the licensing agreement and also to tee up the cancellation of the Tri-Agreement required advance coordination and planning between all the defendants. . . .  The entire Index Committee plus all of the other defendants had to be involved for this to happen."), 190 ("The plot to steal BTWW's intellectual property and Z[abit]'s interest in the BTI required the carefully-planned coordination of each of the named defendants.  They each knowingly and willingly contributed

---

[5] Throughout the Amended Complaint, Plaintiffs often alleged conduct committed by "defendants," without specifying any of the 23 named Defendants, such as with respect to this allegation.  For purposes of summarizing the Amended Complaint's factual allegations, the Court adopts Plaintiffs' generalized allegations as to the conduct of Defendants.

the efforts they had been asked to provide under the plot."); *see also* Opposition at 25 ("Upon information and belief, Medin and/or Gregory and/or Bridwell disclosed the trade secret to BTI or assisted BTI in misusing it. <u>Someone</u> had to disclose the secret to BTI or those who helped develop the EQM Index." (emphasis in original)); *but see* Dkt. 108 (agreeing to dismiss Defendants Avarde, Wenzel, Toroso Investments, Venuto, Edmonson, Bak, ACSI Funds, and Exponential ETFs). Plaintiffs also contend that "[a]ll of the named, conspiring defendants had either signed non-disclosure agreements or became affiliates or consultants of BTI/B[randometry] and, because of that, were prohibited from using the know how they had acquired about how the BTW50 Index worked for any purpose that was against the interests of BTI/B[randometry] or plaintiffs." Second Amended Compl. ¶ 13.

## B. Procedural History

Plaintiffs filed their initial Complaint on January 21, 2020. Dkt. 1. Plaintiffs then filed their First Amended Complaint on April 12, 2020, Dkt. 57, and their Second Amended Complaint, pursuant to a stipulation between the parties, Dkt. 62, on June 1, 2020. The Brandometry Defendants, the Tenet Defendants, Gregory, Zarabi, and the Bacon Defendants have all filed motions to dismiss. This case was reassigned to the undersigned on September 29, 2020, while those motions were pending. Those motions were fully briefed as of January 5, 2021.

## II. Legal Standard

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In deciding a motion to

dismiss, a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor," *LaFaro v. N.Y. Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009) (citation and internal quotation marks omitted), but is "not bound to accept as true legal conclusions couched as factual allegations," *id.* at 475-76 (citing *Iqbal*, 556 U.S. 662).

### III. Discussion

Defendants move to dismiss on several grounds. The Court begins with the Brandometry Defendants', the Tenet Defendants', and Zarabi's motions to dismiss Plaintiffs' DTSA claim. The Court concludes that Zabit—based on his own allegations—lacks standing to bring a claim under the DTSA and, in any event, the DTSA claim must be dismissed pursuant to Rule 12(b)(6) for failure to state a claim upon which relief may be granted. Because the Court declines to exercise supplemental jurisdiction over the state law claims, the Court does not reach the other grounds for dismissal raised by Defendants.

### A. Plaintiffs' DTSA Claim

#### 1. Standing

The DTSA provides a private right of action for "[a]n owner of a trade secret that is misappropriated . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). The DTSA defines the "owner" as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed." *Id.* § 1839(4). The Brandometry Defendants, the Tenet Defendants, and Zarabi each assert that Zabit lacks standing to pursue a DTSA claim because he does not hold title to or a license in the alleged secrets, and he did not sue derivatively on BTWW's behalf. *See* Brandometry Defendants Motion at 4-5; Tenet Defendants Motion at 10-11; Zarabi Motion at 11 (incorporating by reference the Brandometry Defendants' argument that Zabit lacks standing). The Tenet

Defendants additionally argue that BTWW "lacks a present ownership interest in the alleged trade secret, having transferred that interest to BTI under a perpetual and exclusive license." Tenet Defendants Motion at 10-11.

Zabit, by his own admission, does not own any trade secret that is potentially at issue in this action. The Second Amended Complaint explicitly alleges that "BTWW is the developer and *exclusive owner* of the intellectual property known as the BrandTransact 50 Index." Second Amended Compl. ¶ 21 (emphasis added). Plaintiffs argue that, notwithstanding this admission, the Second Amended Complaint "make[s] clear that Zabit possesses . . . 'equitable' ownership of [the index]," and therefore he fits within the DTSA's definition of "owner," which includes a person with "equitable title" to a trade secret. Dkt. 139 ("Opposition") at 13 (citing Second Amended Compl. ¶¶ 70, 330); *see also* Second Amended Compl. ¶¶ 70 ("Z[abit], through BTWW, was listed as contributing an exclusive license agreement to BTI . . . ."), 330 (requesting that the Court "enter a judgment declaring that Z[abit] and BTWW are the sole and exclusive owners and licensees of the BTW50 Index and its underlying algorithms"). Plaintiffs state that, although they "have not found any authority interpreting the phrase 'equitable title' under the DTSA," "in analogous areas of law" it means the person with control over the asset. Opposition at 13-14. In support, Plaintiffs point to *SEC v. McGinn, Smith & Co.*, which concerned the equitable distribution of jointly-owned assets. 752 F. Supp. 2d 194, 207 (N.D.N.Y. 2010) ("Where a defendant and relief defendant jointly own an asset, the central inquiry concerns the element of control implicating the concept of equitable ownership. Such ownership is established when an individual exercises considerable authority over the asset acting as though its assets are his alone to manage and distribute." (internal quotation marks, citations, and alterations omitted)), *order vacated in part on reconsideration sub nom.*, *SEC v. Wojeski*, 752 F. Supp. 2d 220 (N.D.N.Y.

2010), *aff'd sub nom.*, *Smith v. SEC*, 432 F. App'x 10 (2d Cir. 2011).

The principle of equitable ownership relevant to *McGinn, Smith & Co.* is inapposite. At issue here is equitable title. *See* 18 U.S.C. § 1839(4) (defining "owner" as "the person or entity in whom or in which rightful legal or equitable title to, or license in, the trade secret is reposed"). Equitable *title* is a "title that indicates a beneficial interest in property and that gives the holder the right to acquire formal title." *Equitable Title*, Black's Law Dictionary (11th ed. 2019). The term is commonly used in intellectual property cases to describe expectant interests. *See, e.g.*, *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991) ("If an assignment of rights in an invention is made prior to the existence of the invention, this may be viewed as an assignment of an expectant interest. An assignment of an expectant interest can be a valid assignment. In such a situation, the assignee holds at most an equitable title. Once the invention is made and an application for patent is filed, however, legal title to the rights accruing thereunder would be in the assignee . . . ." (citations omitted)). There is simply no reason to import principles of joint ownership governing property distribution into the DTSA.

Both the Second Amended Complaint and Plaintiffs' opposition are devoid of any facts even suggesting that Zabit has any sort of expectant interests giving rise to "equitable title" in the index, as that term is commonly used in intellectual property law. Accordingly, the Court finds that Zabit lacks standing to sue. The Court also denies Plaintiffs' cursory request to amend the Second Amended Complaint to "make perfectly clear that Zabit claims an equitable interest in the title to the BTW50 Index," Opposition at 14-15, as Plaintiffs have not alleged any facts or theories that would make an amendment anything but futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (denying leave to amend where plaintiff "suggested no new material she wishe[d] to plead" and the "problem with [her] causes of action [was] substantive," making repleading

"futile"); *Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060 (TPG), 2017 WL 4082306, at *4 (S.D.N.Y. Sept. 13, 2017) ("Plaintiff does not allege any new facts that change this outcome. Thus, this claim is futile, and the court denies plaintiff's motion to amend on this claim.").

BTWW, however, does have standing to sue. The Tenet Defendants alone argue that BTWW "lacks a present ownership interest in the alleged trade secret, having transferred that interest to BTI under a perpetual and exclusive license." Tenet Defendants Motion at 10-11. The Tenet Defendants have not provided any support for the proposition that a license extinguishes ownership. In fact, "[t]rade secret licenses are generally 'rental' agreements, under which the trade secret holder retains ownership." *Nova Chems., Inc. v. Sekisui Plastics Co.*, 579 F.3d 319, 328 (3d Cir. 2009) (citing Pooley, Trade Secrets § 8.06 (2009)). Moreover, although BTWW did grant BTI an exclusive license to use the index, Plaintiffs allege that Medin dissolved that very agreement. *See* Second Amended Compl. ¶¶ 173-174. The Court thus concludes that BTWW may proceed with its DTSA claim.

### 2. Existence of a Trade Secret

Second, Zarabi, the Brandometry Defendants, and the Tenet Defendants argue that Plaintiffs have not sufficiently pleaded the existence of a trade secret. *See* Tenet Defendants Motion at 11-13; Brandometry Defendants Motion at 5-10; Zarabi Motion at 11-13. The DTSA defines "trade secret" to include "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes," so long as: (1) "the owner thereof has taken reasonable measures to keep such information secret" and (2) "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person

who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

In assessing DTSA claims, courts in this Circuit often look to New York trade secret law. *See ExpertConnect, LLC v. Fowler*, No. 18 Civ. 4828 (LGS) 2019 WL 3004161, at *4 n.1 (S.D.N.Y. July 10, 2019). Because "[t]he elements for a misappropriation claim under New York law are fundamentally the same" as a DTSA claim, "courts have found that a '[c]omplaint sufficiently plead[ing] a DTSA claim . . . also states a claim for misappropriation of trade secrets under New York law.'" *Iacovacci v. Brevet Holdings, LLC*, 437 F. Supp. 3d 367, 380 (S.D.N.Y. 2020) (quoting *ExpertConnect, LLC*, 2019 WL 3004161, at *7). Under New York law, "[a] plaintiff claiming misappropriation of a trade secret must prove: (1) it possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Mgmt. Servs., Inc. v. Digit. Transactions, Inc.*, 920 F.2d 171, 173 (2d Cir. 1990) (internal quotation marks omitted). In making such an assessment, New York courts consider:

> (1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the business] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Id.* (quoting *Eagle Comtronics, Inc. v. Pico, Inc.*, 453 N.Y.S.2d 470, 472 (App. Div. 1982)). The "'most important consideration' in determining whether information is a trade secret is 'whether the information was secret.'" *Broker Genius, Inc. v. Zalta*, 280 F. Supp. 3d 495, 514 (S.D.N.Y. 2017) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir. 1986)). "If an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished."

*Structured Cap. Sol., LLC v. Commerzbank AG*, 177 F. Supp. 3d 816, 832 (S.D.N.Y. 2016)

(quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002 (1984)).

"While neither the New York Court of Appeals nor the United States Court of Appeals for the Second Circuit has expressly required trade secrets to be identified with any particular degree of specificity, it is evident that a 'vague and indefinite' piece of information cannot be protected as a trade secret." *Broker Genius, Inc.*, 280 F. Supp. 3d at 515. Accordingly, "[a]lthough there is 'no heightened pleading requirement on actions brought under the DTSA,'" *Iacovacci*, 437 F. Supp. 3d at 380 (quoting *Tesla Wall Sys., LLC v. Related Cos., L.P.*, No. 17 Civ. 5966 (JSR), 2017 WL 6507110, at *10 (S.D.N.Y. Dec. 18, 2017)), and plaintiffs are not "required to plead" each of the six factors generally considered under New York law, *Charles Ramsey Co., Inc. v. Fabtech-NY LLC*, No. 18 Civ. 0546 (LEK) (CFH), 2020 WL 352614, at *14 (N.D.N.Y. Jan. 21, 2020) (quoting *Uni-Sys., LLC v. U.S. Tennis Ass'n, Inc.*, 350 F. Supp. 3d 143, 172 (E.D.N.Y. 2018)), "district courts in this circuit routinely require that plaintiffs plead their trade secrets with sufficient specificity to inform the defendants of what they are alleged to have misappropriated," *Iacovacci*, 437 F. Supp. 3d at 380 (quoting *Medidata Sol., Inc. v. Veeva Sys. Inc.*, No. 17 Civ. 589 (LGS), 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018)); *see Broker Genius, Inc.*, 280 F. Supp. 3d at 514-15 (collecting cases).

As Defendants rightly point out, Plaintiffs' descriptions of the "trade secrets" are rather broad and verge on overly-vague. Plaintiffs define their trade secrets as the "algorithms, proprietary formulas, patterns, methodology, technical information, processes, programs, codes and compilation of information used to develop, and which continue to underlie, both the BTW50 Index and BVAL ETF." Second Amended Compl. ¶ 197; *see also id.* ¶¶ 19 (contending that Defendants "stole the trade secrets underlying the BTW50 Index"), 193 (alleging that Defendants'

use of "[t]he intellectual property of the BTW50 Index . . .to drive their copycat EQM Index constitutes a theft and/or misappropriation of plaintiff's trade secrets").  Plaintiffs give little detail, and even vacillate between claiming there is one "algorithm," *see, e.g.*, *id.* ¶¶ 18, 64, 88, 101, 108, 110, and several "algorithms," *see e.g.*, *id.* ¶¶ 12, 14, 97, 121, 185, 195.  Plaintiffs' definition of their "trade secrets" would also seemingly encompass the Tenet Defendants' brand data, which Plaintiffs, of course, do not own.  *See* Tenet Defendants Motion at 12 (arguing that Plaintiffs' claims "improperly encompass[] proprietary information and processes that indisputably *belong to Tenet*, not to either of the plaintiffs"); Second Amended Compl. ¶ 197 (including the "technical information" and "compilation of information used to develop . . . the BTW50 Index").  Finally, to the extent that Plaintiffs claim ownership over information and processes underlying the BVAL ETF—beyond, of course, the BTW50 Index—the Second Amended Complaint is devoid of any facts supporting that Plaintiffs own such information or that it was even a secret.

While the Second Amended Complaint is not a model of clarity, the Court nonetheless concludes that Plaintiffs provide sufficient notice of the purported secret at issue.  These are not the type of "vague and indefinite" claims, *Broker Genius, Inc.*, 280 F. Supp. 3d at 515, that are insufficient to "inform the defendants of what they are alleged to have misappropriated," *Iacovacci*, 437 F. Supp. 3d at 380 (quoting *Medidata Sol., Inc.*, 2018 WL 6173349, at *3).  Courts in this District often allow trade secret claims that are broad so long as they provide sufficient detail that the defendant can identify the trade secret(s) at issue.  *See, e.g.*, *Pauwels v. Deloitte LLP*, No. 19 Civ. 2313 (RA), 2020 WL 818742, at *4 (S.D.N.Y. Feb. 19, 2020) (finding that the plaintiff had sufficiently alleged the existence of a trade secret by describing an analytic model in general terms, including that it consisted of a "proprietary set of formulas . . . incorporat[ing] [the plaintiff's] unique insight into the alternative energy market" and served as a "valuation tool");

*Tesla Wall Sys., LLC*, 2017 WL 6507110, at *10 ("Tesla's complaint . . . pleads numerous specific categories of [trade secret] information, such as 'technical data, internal pricing information, work product, research, engineering designs,' etc.").

The Brandometry Defendants cite two primary cases in support of their argument that Plaintiffs' DTSA claim is so vague that it should be dismissed—*Elsevier Inc. v. Dr. Evidence, LLC*, No. 17 Civ. 5540 (KBF), 2018 WL 557906 (S.D.N.Y. Jan. 23, 2018), and *Lawrence v. NYC Medical Practice, P.C.*, No. 18 Civ. 8649 (GHW), 2019 WL 4194576 (S.D.N.Y. Sept. 3, 2019). Both cases are distinguishable. The counterclaimants in *Elsevier* listed "nine extraordinarily general categories" of purported trade secrets: their "GROWTH initiative," "clinical methods relating to executing projects and related protocols and information," "data configuration protocols and methods," "interpretation of data," "process to assess the quality of evidence and how to execute it," "assessments of the risk of bias of the evidence based on the funding source," "analytics, analytics tools, and analytics programming," "ontology process and tools, including [their] unique and proprietary process for 'binding' collecting original terms in a publication and then binding the like terms and synonyms to that original term," and "database field names, parameters and database schema information embedded within the summaries [they] delivered to [the plaintiff]." *Elsevier Inc.*, 2018 WL 557906, at *5-6. The court found that these were insufficient, since a pleading is required to do more than "simply list general categories of information." *Id.* at *6.

Similarly, the court in *Lawrence* dismissed the plaintiffs' broad claims that their trade secrets "includ[ed] the methods for advertising and communicating with prospective patients," as well as secrets related to "patient coordination and signing up patients" and "services used, sold, and ordered in, or intended to be used, sold and/or ordered in interstate and/or foreign commerce."

*Lawrence*, 2019 WL 4194576, at *5.  While certain statements in the Second Amended Complaint do echo those in *Elsevier* and *Lawrence*, Plaintiffs tie the broad categories of information to the specific algorithm(s) underlying the BTW50 Index.  This is, in fact, in line with the alternative avenues that the court in *Elsevier* suggested *could* raise a claim.  *See Elsevier*, 2018 WL 557906, at *6 ("While it is not necessary to disclose every detail of an alleged trade secret in a complaint, [the counterclaimant] could have explained that its 'interpretation of data' or 'process to assess the quality of evidence' relies on a specific, proprietary algorithm developed at a certain time and which no one else owns.").

And the use of the Tenet data does not necessarily nullify the algorithm's status as a trade secret.  The Second Circuit has held that a "trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."  *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 174  (quoting *Imperial Chem. Indus. Ltd. v. Nat'l Distillers and Chem. Corp.,* 342 F.2d 737, 742 (2d Cir. 1965)).  In a similar vein, although Plaintiffs cannot lay claim to the Tenet data, the algorithm and its methodology for using that data might still be protected.

Plaintiffs also allege facts relating to other factors relevant under the DTSA and New York law.  For instance, Plaintiffs allege facts supporting a plausible claim that "the information derives independent economic value, actual or potential."  18 U.S.C. § 1839(3)(B).  Specifically, they allege that they can license the algorithm, *see* Second Amended Compl. ¶ 201, and that license was valued at $540,000 in the First Operating Agreement, *id.* ¶ 70.  Even though the license to BTI may have been royalty-free, *see* Brandometry Defendants Motion at 9, the DTSA covers *potential* value, *see* 18 U.S.C. § 1839(3)(B), and the allegations regarding the BTW50 Index's and

the products' potential value are sufficient to survive a motion to dismiss.[6] Plaintiffs also contend that Zabit made a significant investment in developing the index. *See, e.g.*, Second Amended Compl. ¶ 9.

However, Plaintiffs have not alleged that they took reasonable measures to guard the secrecy of the information. *See* 18 U.S.C. § 1839(3); *Integrated Cash Mgmt. Servs., Inc.*, 920 F.2d at 173. In fact, Plaintiffs' own allegations in the Second Amended Complaint make plain that they failed to take reasonable measures to protect the secrecy of the BTW50 Index and the underlying algorithm. This is fatal to their claim.

In defending their efforts to keep the information secret, Plaintiffs primarily rely on "a web of non-disclosure and confidentiality agreements" that they had "with Medin (personally and through LAM [Associates, Inc.]) and Venuto, and also with Tenet." Plaintiffs' Opposition at 21; *see* Second Amended Compl. ¶¶ 87, 100. In the Second Amended Complaint, Plaintiffs specify three sets of confidentiality agreements: (1) NDAs between Medin and Zabit signed before each consulting meeting, *id.* ¶ 62; (2) an NDA between Venuto and Zabit, *id.*; and (3) an NDA between Bridwell, on behalf of Tenet, with BTI, *id.* ¶ 87.[7] Courts have been skeptical that a confidentiality agreement alone can "suggest the existence of trade secret." *Lawrence*, 2019 WL 4194576, at *5

---

[6] Plaintiffs' second assertion of why there is value—that "they had the exclusive ability to market their own ETF, the BVAL ETF, and to have consumers invest, and to persuade [Registered Investment Advisors] to invest their own clients', funds in the BVAL ETF"—is far more suspect. Second Amended Compl. ¶ 202. BTI, not Plaintiffs, launched the BVAL ETF. *Id.* ¶ 4. It is therefore difficult to conclude that Plaintiffs—particularly BTWW, the only plaintiff with standing—could "exclusive[ly]" market the BVAL ETF, at least on the facts in the Second Amended Complaint. Regardless, because the Court finds that the licensing power is sufficient economic value, the Court need not resolve this issue.

[7] Plaintiffs state in their opposition that Gregory was subject to a confidentiality agreement. *See* Zabit Opposition at 25. But they do not allege this in their Second Amended Complaint, nor have they requested leave to add any factual allegations. Regardless, the existence of a confidentiality agreement as to Gregory would not impact the Court's analysis that follows.

(quoting *Elsevier, Inc.*, 2018 WL 557906, at *6). Although the Court does not hold that confidentiality agreements alone can *never* support a finding of a trade secret, the agreements at issue here are insufficient when considered in light of the facts acknowledged by Plaintiffs, which reflect a failure to take reasonable measures to guard any secrecy as to the BTW50 Index or the underlying algorithm.

In fact, Plaintiffs admit that they licensed the BTW50 Index to BTI, but they do not allege, or even argue, that BTI was required to keep any information confidential under the terms of that license. Courts regularly deny trade secret protection if the owner voluntarily discloses the alleged secret. *See, e.g.*, *Structured Cap. Sols., LLC*, 177 F. Supp. 3d at 832 (granting defendant's motion for summary judgment on a trade secret misappropriation claim because the agreement between the plaintiff and defendant did not require defendant to keep the information confidential); *Nova Chems., Inc.*, 579 F.3d at 327-28 (recognizing that although "a trade secret owner may license its secret information without losing legal protections," the license in that case "lost its trade secret status" because the license did not require the lessor to maintain the secrecy of any information); *see also Ruckelshaus*, 467 U.S. at 1002 ("[I]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information . . . , his property right is extinguished."); *Broker Genius, Inc.*, 280 F. Supp. 3d at 520-23 (declining to find a trade secret because "[plaintiff] g[ave] each of its users access to its purported trade secrets" without any "oral representations to its users that its software or any of its components are confidential," and because the license did not contain a confidentiality provision); *cf. Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, No. 95 Civ. 4552 (MBM), 1996 WL 531873, at *7 (S.D.N.Y. Sept. 19, 1996) ("Distribution to clients of a computer program through a licensing agreement *requiring confidentiality* does not destroy secrecy of a trade secret, but rather reinforces it." (emphasis added)). And although

Plaintiffs contend that the license was the "natural result" of the fact Zabit had the majority share of both BTWW and BTI, Second Amended Compl. ¶ 83, Zabit does not allege that he took any efforts to modify that license when he lost majority ownership of BTI. In fact, the Reorganization Agreement specifically stated that the licensing agreement would "remain in effect" and would "not be affected by the execution" of that agreement. Dkt. 91, Exh. 3 at 4-5.[8]

Moreover, and most significantly, the Second Amended Complaint is rife with allegations acknowledging that several individuals and entities—in addition to BTI—knew the details of the algorithm but were not subject to any confidentiality agreements or otherwise instructed to keep the information confidential. This includes, at a minimum, Edgar Baum, Monny Sklov, ACSI Funds, Exponential ETFs, Phil Bak, Jane Edmonson, and Charles Ragauss. *See, e.g.*, Second Amended Compl. ¶¶ 57 ("Z[abit] and Bidlack also brought Monny Sklov, Ph.D., a licensed securities broker, and economist Edgar Baum into the early development stages of the BrandTransact Index."), 120 ("R[agauss] served as Director-in-Charge of BTI's ETF product management, [and] . . . was also the liaison between BTI, T[enet] and Wilshire, [which] . . . made him intimately knowledgeable about the underlying, proprietary algorithm of the BTW50 Index . . . ."). In fact, it seems that everyone on the Index Committee, save Medin and Venuto, had "intimate[] knowledge" of the algorithm yet did not have to sign a confidentiality agreement. *Id.*

---

[8] Although Plaintiffs did not attach the Reorganization Agreement to the Second Amended Complaint, it is well-settled that in considering a motion to dismiss under Rule 12(b)(6), a court may consider not only the facts alleged in the complaint and "any written instrument attached to the complaint," but also "statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). Here, the Reorganization Agreement was incorporated by reference, as Plaintiffs extensively reference it and rely upon it in asserting their claims. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (finding that the plaintiff's complaint incorporated by reference two documents that it "explicitly refer[ed] to and relie[d] upon" to establish the plaintiff's claim); *see, e.g.*, Second Amended Compl. ¶¶ 7, 136, 138, 143, 144, 146.

¶¶ 110 (alleging that Edmonson's "participation as the executive-in-charge of EQM, which eventually created the cloned, copycat EQM Index, plus her involvement as a member and Chair of the Index Committee, made her knowledgeable of every aspect of the underlying algorithm for the BTW50 Index"), 117-119 (alleging that Bak, by virtue of his membership on the Index Committee and role "as the executive-in-charge for both ACSI and E[xponential ETFs]," two companies involved in launching the BVAL ETF on the New York Stock Exchange, made him "intimately knowledgeable about every aspect of the underlying algorithm for the BTW50 Index"). Although Plaintiffs repeatedly state that these individuals' knew about "all binding agreements among BTWW, BTI, T[enet,] and Wilshire Associates," *id.* ¶¶ 101, 110, 112, 119-120, their knowledge of these agreements says little about any "reasonable efforts" BTWW took to maintain the secrecy of its algorithm or their *own* obligations to keep this information secret. As noted above, when "an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, . . . his property right is extinguished." *Structured Cap. Sol., LLC*, 177 F. Supp. 3d at 832 (quoting *Ruckelshaus*, 467 U.S. at 1002).

Plaintiffs' arguments otherwise are unavailing. First, Plaintiffs assert in their opposition that "BTI merely had a license to use the BTW50 Index," but did not have "a license to pry open the black box and look within." Opposition at 24. But the Second Amended Complaint says nothing about any limitations placed on the use of the license. Regardless, this is a distinction without a difference; the fact remains that Plaintiffs licensed the BTW 50 Index and willingly handed over the underlying algorithm without any requirement that BTI keep that index or algorithm secret. And Plaintiffs similarly did so with a host of others.

Second, Plaintiffs suggest that the fact "Tenet provided its brand valuation data under an exclusive agreement" supports their efforts to maintain the algorithm a trade secret, because "even

if someone stole or reverse-engineered BTWW's algorithm, it would not have the same data set to work with and its results would diverge." *Id.* at 21. Although obtaining an exclusive license from Tenet may have provided Plaintiffs with a competitive advantage, it says little about Plaintiffs' efforts to keep the algorithm itself secret.

Third, and finally, Plaintiffs, while acknowledging that "[i]t may well be the better practice to have others besides those who needed access to the algorithm sign NDA's," seemingly assert that certain Defendants' purported "duty of loyalty" to BTWW is enough to sustain a trade secrets claim. *See* Opposition at 22-23 ("Similarly, defendants' hollow arguments that the parties involved—officers or consultants retained by plaintiffs—owed no type of loyalty or duty that would prevent them from stealing information encrusted [sic] to them and then to compete against the company providing it would raise the concept of *caveat emptor* in this context to a new level. The notion that they would be free to do all that unless the company had taken great care to have them agree not to do so in writing is anathema to settled norms."); *see also* Second Amended Compl. ¶ 203 ("Defendants used plaintiffs' trade secrets in breach of their agreements and in violation of their confidential relationships and/or duties with or to plaintiffs and/or as a result of discovery by improper means."). But while a duty of loyalty could perhaps be relevant to whether there was a misappropriation, it does not somehow transform this freely-shared information into a *secret*. To hold otherwise would risk expanding the limited category of "trade secrets" to cover any confidential information. But it is well-settled that trade secrets "are a narrow category of confidential information." *Elsevier Inc.*, 2018 WL 557906, at *4. Plaintiffs also seem to rely on a purported duty of loyalty to *BTI*. *See* Second Amended Compl. ¶ 13 (contending that "[a]ll of the named, conspiring defendants had either signed non-disclosure agreements or became affiliates or consultants of BTI/B[randometry] and, because of that, were prohibited from using the know

how they had acquired about how the BTW50 Index worked for any purpose that was against the interests of BTI/B[randometry] or plaintiffs").  BTI is, of course, a Defendant in this action, and thus this does little to advance Plaintiffs' claims.

Plaintiffs must show only "sufficient secrecy," not "absolute secrecy," meaning that "except by use of improper means, there would be difficulty in acquiring the information."  *Uni-Sys., LLC*, 350 F. Supp. 3d at 175 (quoting *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 232 (S.D.N.Y. 1988)).  But the aforementioned facts which Plaintiffs themselves plead or otherwise acknowledge—that numerous other individuals had access to the algorithm underlying the BTW50 Index and that Plaintiffs licensed the information to BTI, all without any confidentiality agreements, instruction to keep the algorithm secret, or other protective security measures—do not even meet the threshold of sufficient secrecy.  This does not necessarily mean certain Defendants may not be liable for theft of the information, even confidential information.  It just means that the information it is not a *trade secret* for purposes of a federal claim under the DTSA.

## B. Plaintiffs' Declaratory Judgment Claim

Plaintiffs also seek a "declaratory judgment."  Second Amended Compl. ¶¶ 329-332.  It is well-settled that the Declaratory Judgment Act, 28 U.S.C. § 2201, "provides a federal remedy, but does not provide any basis for a federal claim in cases in which there is no independent basis for exercising federal subject matter jurisdiction."  *Universal Processing LLC v. Weile Zhuang*, No. 17 Civ. 10210 (LTS), 2018 WL 4684115, at *4 (S.D.N.Y. Sept. 28, 2018).  Plaintiffs seem to acknowledge as much, contending that "if Count I," for a violation of the DTSA, "survives, a federal question exists to support Count XX, which seeks a declaratory judgment."  Opposition at 26.  Accordingly, because the Court dismisses Plaintiffs' DTSA claim, there is "no other viable basis for federal jurisdiction or substantive relief under federal law," and the cause of action for

declaratory relief must be dismissed. *Universal Processing LLC*, 2018 WL 4684115, at *4.

## C. Plaintiffs' Remaining State Law Claims

Having dismissed the only federal law claim, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims. A district court has discretion to exercise supplemental jurisdiction over state-law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). It is well-established, however, that generally "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)). Here, the traditional "values of judicial economy, convenience, fairness, and comity" do not weigh in favor of exercising jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). This case is at an early stage, and discovery has not even begun. The Court therefore dismisses Plaintiffs' state-law claims without prejudice to refiling in state court. *See* 28 U.S.C. § 1367(c)(3); *TRB Acquisitions LLC v. Yedid*, No. 20 Civ. 0552 (JMF), 2021 WL 293122, at *2 (S.D.N.Y. Jan. 28, 2021).

## IV. Conclusion

For the aforementioned reasons, the Brandometry Defendants', the Tenet Defendants', and Zarabi's motions to dismiss the DTSA claim are granted. Because dismissal is based on the Court's conclusion that, in light of Plaintiffs' own acknowledgements of certain facts, the index and algorithm at issue cannot be trade secrets under the DTSA, any further amendment of the Complaint would be futile and the DTSA claim is dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law claims, and dismisses those claims without prejudice.

The Clerk of the Court is respectfully directed to terminate all pending motions and close this case.

SO ORDERED.

Dated: May 18, 2021
      New York, New York

                                    JOHN P. CRONAN
                           United States District Judge